UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JACKIE DELMAS MASON,

Petitioner,

v.                                      Case No. 18-cv-1351-pp

RANDALL HEPP,

Respondent.

**ORDER GRANTING PETITION FOR WRIT OF *HABEAS CORPUS*
(DKT. NO. 1) AND ORDERING STATE OF WISCONSIN TO RELEASE OR
RETRY PETITIONER WITHIN 120 DAYS, GRANTING "PETITIONER'S
MOTION TO MOTION TO DISMISS CLAIM OF JUDICIAL BIAS AGAINST
WISCONSIN COURT OF APPEALS" (DKT. NO. 13), DENYING AS MOOT
"PETITIONER'S MOTION TO CORRECT DOCUMENT" (DKT. NO. 17),
DENYING AS MOOT "PETITIONER'S MOTION TO MOTION FOR
DIRECTIONS FROM THE COURT" (DKT. NO. 20) AND GRANTING
"PETITIONER'S MOTION TOO MOTION TO EXPAND RECORD"
(DKT. NO. 24)**

On August 31, 2018, the petitioner, who is incarcerated at Waupun
Correctional Institution and is representing himself, filed a petition for a writ of
*habeas corpus* under 28 U.S.C. §2254 challenging his 2012 conviction in
Milwaukee County Circuit Court for third-degree sexual assault and aggravated
battery. Dkt. No. 1.

Because the Wisconsin Court of Appeals' rejection of one of the
petitioner's claims resulted from an unreasonable determination of the facts in
light of the evidence presented in the state proceeding and involved an
unreasonable application of clearly established federal law, the court will grant

1

the petition and give the state 120 days by which to release the petitioner or retry him. This order also disposes of the other pending motions in the case.

## I.    **Background**

### A.    <u>Underlying State Case</u>

#### 1.    *Trial in Milwaukee County Circuit Court*

##### a.    Proceedings prior to request for self-representation

On January 14, 2012, the State filed a criminal complaint in Milwaukee County Circuit Court charging the petitioner with two counts of third-degree sexual assault and four counts of substantial battery. Dkt. No. 18-2 at ¶2; <u>State v. Mason</u>, Milwaukee County Case No. 2012CF000228 (available at https://wcca.wicourts.gov). "The victim of all six crimes was [the petitioner's] girlfriend, S.L., who is disabled." Dkt. No. 18 at ¶2.

Although Attorney Mary Guimont appeared with the petitioner at his January 15, 2012 initial appearance, by the January 25, 2012 preliminary hearing, the petitioner was represented by Attorney Jeff T. Wilson. <u>Mason</u>, Case No. 2012CF000228. At a February 8, 2012 scheduling conference before Judge Rebecca F. Dallet, the petitioner (who was in custody) was not produced; the court scheduled a final pretrial conference for April 2, 2012 and a trial for May 7, 2012. <u>Id.</u> The petitioner was not present for the April 2, 2012 final pretrial conference or for a May 3, 2012 hearing on a defense motion to adjourn the trial. <u>Id.</u> The next time the petitioner appeared in court was on May 7, 2012— the date that had been set for trial. The docket notes for that hearing indicate that Attorney Wilson informed the court that "there [was] a lack of

2

communication between the defendant and himself," and Wilson moved to withdraw. Id. Judge Dallet granted the motion and scheduled a status conference for May 15, 2012. Id.

The petitioner was not produced for the May 15, 2012 status, but Attorney Michael John Hicks appeared, indicating that he had just been appointed and would like time to review the discovery. Id. Judge Dallet adjourned for a status conference on May 30, 2012. Id. The public docket indicates that the same day—May 15, 2012—the court received "Letters/correspondence" from the petitioner. Id.

The May 30, 2012 status conference was adjourned because the prosecutor was not available. Id. At a June 1, 2012 status conference (for which the petitioner was not produced), Judge Dallet scheduled a motion hearing and final pretrial conference for August 10, 2012 and a jury trial for September 10, 2012. She also informed the parties that as of July 30, 2012, the case would be reassigned to Judge Ellen Brostrom. Id. There was no mention of any letters or correspondence from the petitioner.

On June 27, 2012, the state filed an "Other Acts" motion. Id.

        b.    First request for self-representation

On August 10, 2012, Judge Brostrom conducted a final pretrial conference. Dkt. No. 18-18. The petitioner appeared in person with Attorney Hicks; this appears to have been the first time the petitioner and Attorney Hicks had been in the courtroom together, and it was the first time the parties had appeared before Judge Brostrom. Id. at 1. Attorney Hicks explained that he

had "[taken] this case from prior counsel somewhat recently." Id. at 2. Observing that the file contained a "handwritten letter . . . date stamped May 15, where [the petitioner] [was] asking to represent himself,"[1] the court inquired whether the court had addressed that letter (presumably asking whether Judge Dallet had addressed it prior to the case being transferred to Judge Brostrom), whether "Mr. Hicks [was] the result of that" and whether the petitioner was "still interested" in self-representation. Id. at 4. The petitioner replied that self-representation "[was] something that [he] [was] still interested in," while Attorney Hicks told the court that he was hearing about the petitioner's request for the first time. Id. The court stated that while a competent defendant had a constitutional right to self-representation, "it would certainly not be something that [it] would do if [it] were in [the petitioner's] shoes." Id. at 4-5. The petitioner replied that he "would like to be placed in a position where [he] could be co-counsel." Id. at 5. The court attempted to clarify the petitioner's request:

> THE COURT:  . . . So at this point are you formally asking the Court to represent yourself, or you just want to make sure that you know what is going—
>
> THE [PETITIONER]:  Well, I was—
>
> THE COURT:  Sir, you can't interrupt the Court. The court reporter is taking everything down that I say. She can't take it down if you talk over me, okay? My question was: Are you formally asking the Court to represent

[1] Neither party provided the court with a copy of this letter.

4

|  |  |
|---|---|
|  | yourself, or you just want to make sure that you are on top of your case? |
| THE [PETITIONER]: | I would like to make a formal recommendation that I could be placed as co-counsel of my case. |
| THE COURT: | You don't have the legal right to be co-counsel because you are not a licensed lawyer. |

Id. at 5-6.

The petitioner then asked the court what would happen if he was "placed as a—to represent myself?" Id. at 6. The court responded:

Then you are at a complete disadvantage, because the State is represented by an attorney who has considerable experience prosecuting these kinds of cases. You are not trained in the law. You don't know the rules, but all of the rules will apply to you. So you would end up really, I think, at the short end of the stick.

Id. This exchange followed:

|  |  |
|---|---|
| THE [PETITIONER]: | Would I have a lawyer working with me? |
| THE COURT: | Yes, he is sitting to your left. |
| THE [PETITIONER]: | He would still be working with me? |
| THE COURT: | Yes, he is your lawyer. |
| MR. HICKS: | He means if he represents himself, Judge. |
| THE COURT: | We could conceivably appoint him as standby counsel. Again, I don't recommend that you represent yourself. I don't think you will be effective. I don't think you are going to serve your cause well. If you really want to pursue that, I can explore whether you are even competent to do so.

Is that what you would like me to do? |
| THE [PETITIONER]: | Yeah, I would like to see. |

5

<u>Id.</u> at 6-7.

The court then asked the petitioner a series of questions:

| | |
|---|---|
| THE COURT: | How old are you, sir? |
| THE [PETITIONER]: | Fifty-two. |
| THE COURT: | Have you ever represented yourself in court before? |
| THE [PETITIONER]: | Only in intake court. |
| THE COURT: | How long ago was that? |
| THE [PETITIONER]: | Four or five years ago. |
| THE COURT: | And has anyone threatened you or promised you anything to get you to give up your right to have a lawyer? |
| THE [PETITIONER]: | Well, the last lawyer I had it seemed like he was working with the State. I am afraid. There is misconduct by the police in this case, and I also believe by the district attorney's office. I don't believe that any lawyer would be too quick to get the blood on his hands. |
| THE COURT: | So has anyone threatened you or promised you anything to get you to give up your right to have a lawyer? |
| THE [PETITIONER]: | No. |
| THE COURT: | And do you understand that in this case you are charged with six counts, and the maximum possible time of incarceration is 44 years? |
| THE [PETITIONER]: | Yes, I am aware of that. |
| THE COURT: | And you understand that the State is going to be represented by a lawyer who is trained |

6

|                     |                                                                                                      |
|---------------------|------------------------------------------------------------------------------------------------------|
| THE [PETITIONER]:   | in the law and very experienced at prosecuting these kinds of cases? |

THE [PETITIONER]:      Yes, I understand that.

THE COURT:             She certainly won't represent your interest, right?

THE [PETITIONER]:      I understand that.

THE COURT:             You understand I am the neutral. I can't represent your interest, right?

THE [PETITIONER]:      I understand that.

THE COURT:             And you understand that if you had a trained lawyer, such as Mr. Hicks, you could potentially get a better outcome in this case?

THE [PETITIONER]:      Well, I don't know about Mr. Hicks. I feel like I could do a better job than Jeffrey Wilson, the last one.

THE COURT:             Well, I have seen Mr. Hicks in trial. He does a very nice job for his clients.

                       The other thing I would note is the law says that all of the rules are going to apply to you as if you had a lawyer. So you don't know the rules of evidence. You don't know how to form questions. You don't know how to get discovery. You don't know how to argue in front of a jury. You don't know any of that because you are not trained in the law, and, yet, all of the rules would still apply to you; do you understand that?

THE [PETITIONER]:      Yes, I understand that.

THE COURT:             Have you ever been diagnosed with any mental health issues or emotional problems?

THE [PETITIONER]:      Never.

7

| THE COURT: | Okay. So given all of that, is it still your desire to represent yourself? |
|---|---|
| THE [PETITIONER]: | It is just a really hard question to say, because I know I didn't do these crimes. They had articles in the paper about the state, how they are paying public defenders, and they are not paying them enough to really adequately represent people. |
| THE COURT: | Mr. Hicks, are you with the state public defender's office, or are you in private practice? |
| MR. HICKS: | It is a private appointment, Judge. Money is irrelevant. I will represent him as best I can. |
| THE [PETITIONER]: | So far Mr. Hicks seems to be doing a good job for me. I just have a feeling that there is not a lot of attorneys that would pursue this case in a way that would bring out the true justice of this matter. Because I know for a fact that what is in those police reports are all false, you know? Where is the surveillance video? |
| THE COURT: | He is tracking them down. You have to answer the question: What do you want to do at this point? Do you want to keep Mr. Hicks on for the moment? |
| THE [PETITIONER]: will keep him. | At this point I will keep him. At this point I will keep him. |
| THE COURT: | Okay. I think that is a wise decision. |

Id. at 7-11.

At that point, the court asked the parties whether they thought it was still "realistic" for the case to begin on September 10, 2012. Id. at 11. The prosecutor responded that she thought that it was "very realistic" and Attorney

8

Hicks responded that he thought that it was "possible," noting that the defendant wanted to keep the trial date. Id. at 11-12.

c. Second request for self-representation

The public docket indicates that on August 17, 2012, the court received "Letters/correspondence" from the petitioner. Mason, Case No. 2012CF000228.

Two weeks later, on August 31, 2012, the court held another final pretrial conference. Dkt. No. 18-19. The petitioner appeared in person with Attorney Hicks. Id. at 1. After discussing discovery issues, the court advised the petitioner that she had received a handwritten letter from him:

| | |
|---|---|
| THE COURT: | Okay. [Petitioner], I did get your handwritten letter. It looks like it was dated August 13th, still seeking to have—to represent yourself. As you can see from being in court today, Mr. Hicks is on top of your case. He has a number of things he needs to— |
| THE [PETITIONER]: | I want him removed. I want to represent myself. |
| THE COURT: | Hold on. And, in fact, I just finished a trial with both of these lawyers, they both did an excellent job, and I will let you know that Mr. Hicks came away with a not guilty verdict. I think you should think long and hard about whether you really want to relieve Mr. Hicks of his job. He is a very competent lawyer and is actively doing what he needs to do to represent you zealously in this matter. |
| THE [PETITIONER]: | I would like to represent myself. If I do get a lawyer, I will hire one on my own. |

9

| | |
|---|---|
| THE COURT: | I don't think we have time for that. Your trial is currently set for September 10th, and I am not planning on vacating that trial date. |
| THE [PETITIONER]: | There is—There is probably—I don't know how many witnesses that haven't been interviewed, because the prior lawyer that I had didn't do anything. So it is not going to be possible to make that trial date. |
| THE COURT: | Mr. Hicks, you said you have an investigator working? |
| MR. HICKS: | I do, Judge. [The petitioner] and I met for some time at the House of Corrections and he told me who he wanted to have talked to. I did get one statement from prior counsel, and they interviewed one witness. I just got that. [The petitioner] hasn't seen that because I just got it. |
| | I did have my investigator go out to contact the other witnesses. I think she is in the process, and she is a good investigator. I suspect once I hear from her this weekend most of that will be done. I told her about the trial date and that we want to keep it. I am pretty confident we can still do it. There is a slim chance we can't. |
| THE COURT: | [Petitioner], I don't find you competent to represent yourself, and I will tell you why. The comments that you are making suggests to me a lack of rationality, and a lack of ability to really adequately evaluate where you are in this trial process and what your best interests are. Your lawyer is doing all of the things that need to be done. You are not going to be able to do them while you are in custody. Your lawyer has a private investigator out speaking to or trying to speak to the witnesses that you think are relevant. You are not going to be able to make that happen while you are in custody. Your lawyer is trained in the law, |

10

|                   |                                                                                                                                                                                                                                                                                            |
|-------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | and the State has submitted a motion to admit other acts evidence. You are not competent to respond to that—                                                                                                                                                                                |
| THE [PETITIONER]: | But I—                                                                                                                                                                                                                                                                                      |
| THE COURT:        | Do not interrupt the Court. You are not competent to respond to that motion. And for you to try to protest to me here today that you think you can do a better job on this than Mr. Hicks, and that you can do it all by September 10th, tells me you are not competent to represent yourself. I deny your motion and make that finding.  Anything further, [petitioner]? |
| THE [PETITIONER]: | I refuse to work with him. He is not—I never had any woman ever call the police on me. I have never been charged with battery, sexual assault.                                                                                                                                              |
| THE COURT:        | [Petitioner], if you choose not to work with your lawyer, then you will actively forfeit the right to have your defense put on according to your best interest. Mr. Hicks will do his best to try the case without your cooperation, but you are going to make it a lot harder for him. I don't think any Court of Appeals is going to find that to be ineffective assistance of counsel, because it will be your fault, not the lawyer's fault.  I am not going to adjourn this case. This is from January of 2012. The victims have a right to a speedy trial just as much as you do. Your lawyer is doing what needs to be done. He is a competent lawyer. Your comments show a lack of competency. You can choose to interact with him or not, but we will have our trial on September 10th. You can either allow your lawyer to represent you with your cooperation, or I am going to make him do it without it. It will be your choice, do you understand? |

11

| | |
|---|---|
| THE [PETITIONER]: | That is not right. |
| THE COURT: | It is right. It is absolutely right. |
| THE [PETITIONER]: | I would like to represent myself. |
| THE COURT: | The fact that you think I am wrong, confirms the fact that you are not competent to represent yourself. Your comments are irrational. They show a complete inability to represent yourself. I find as a matter of law that you are not competent to do so. |
| THE [PETITIONER]: | You called me competent the last time I was here. |
| THE COURT: | No, I didn't. We ended the dialogue by you saying you wanted to continue with Mr. Hicks. |
| THE [PETITIONER]: | When I first talked to Mr. Hicks I said what do you have planned? He said I have a couple of motions I want to file. He hasn't done that. He hasn't kept his word. I don't trust this man with my life in his hands. |
| THE COURT: | I will tell you what, [petitioner], the case of State versus Jones, 2010 Wisconsin 72, says that you are entitled to a competent lawyer. You are not entitled to one that you like. |
| | I don't care if you like Mr. Hicks. He is a good lawyer. He is doing what a good lawyer needs to do on your behalf. So that is the end of this conversation. |
| | We will set another final pretrial before our September 10th jury trial, and at that time I will decide the State's other acts motion. |

Dkt. No. 18-19 at 4-9. The court set the next final pretrial for September 6th.

Id. at 9.

d.      Pretrial motions

The state court docket shows that over the following week, the defense filed three motions—a motion to dismiss, a motion to sever charges and a motion to compel discovery. Mason, Case No. 2012CF000228 (docket entries for September 5 and 6, 2012). The petitioner provided the court with what appears to be a portion of the motion to compel. Dkt. No. 23 at 38. The motion sought production of the health care records of complaining witness Sally L. from 2006 to 2012. Id. The motion explained that Sally L. was the alleged victim of two third-degree sexual assaults and four acts of substantial battery, all committed between July 2006 and January 10, 2012. Id. at 38-39. It explained that the petitioner was denying that these events had happened. Id. at 39. The motion sought Sally L.'s health care records to prove, for example, that her allegation that she had old fractures from injuries caused by the petitioner were false. Id. It asserted that Sally L.'s claims that the petitioner had taken for himself her prescription for Hydrocodone were false and argued that the health care records would show that she had no prescription for Hydrocodone. Id. The motion explained that Sally L. had testified at the preliminary hearing that she'd been attacked by a gang in 1980, which had resulted in her having to have her face totally reconstructed; Sally L. had alleged that the petitioner knew of this and that he would "hit her in the face because she knew it would hurt her more because of the prior surgery." Id. at 39-40. The motion asserted that Sally L.'s medical records would show that her claim of reconstructive surgery was false. Id. at 40. The motion asserted that

13

Sally L.'s medical records would belie her claims that the petitioner regularly beat her, that he stomped and kicked her in the abdomen on one occasion, that he had tortured her and that he'd caused her other injuries. Id. Finally, the motion asserted that Sally L. had told the defense investigator that she'd been hospitalized as a result of being sexually assaulted and sodomized, then had recanted that claim; the motion asserted that Sally L.'s medical records would reveal whether she had lied about being hospitalized as the result of a sexual assault. Id.

The prosecutor and Attorney Hicks appeared for the September 6, 2012 final pretrial conference but the petitioner was not produced; the court adjourned the hearing to the following day (September 7, 2012) at 8:30 a.m. Mason, Case No. 2012CR000228. At the hearing on September 7, 2012, the court adjourned the trial so that it could hear and decide the pending motions. Id. The docket indicates that at the September 10, 2012 hearing, the state "provided medical records to defense." Id.[2] The court heard argument on the motion to dismiss, taking that motion under advisement. The docket remarks indicate that the state was seeking to admit "Other Acts Evidence" and indicated that the court would hear argument on that motion and the motion to sever "at a later date." Id. The court scheduled another motion hearing for

---

[2] At trial, the prosecutor advised the court that the motion to compel production of the medical records was "resolved without a court ruling." Dkt. No. 18-10 at 13. The prosecutor told the court that she had "turned over 265 pages of medical records to defense," and that they were certified. Id.

October 4, 2012 and rescheduled the jury trial for November 26, 2012 at 9:00 a.m. Id.

e.  Petitioner's correspondence with the court and additional requests for self-representation

The state court docket shows no further hearings between September 10, 2012 and October 4, 2012. But in the interim, the court received three letters from the defendant—one on September 26, 2012, another on September 27, 2012 and a third on October 2, 2012. Id. In an appendix to his brief, the petitioner provided a copy of the letter the trial court received on September 26. Dkt. No. 23 at 47. In it, he complained to the court that the transcripts of his preliminary hearing were not "legitimate," because they did not reflect the testimony that he had heard in court or the information in the police reports. Id. The petitioner stated that "[t]his matter and others" were causing him concern and "this is why I have ask[ed] for Mr. Hicks to be removed." Id. The petitioner took issue with several things Attorney Hicks had said in the motion to compel Sally L.'s medical records. He argued that he'd never told Attorney Hicks that Sally L. was not being prescribed Hydrocodone; rather, he said that Sally L. was selling her pills to him and others. Id. at 47-48. The petitioner said he'd never told Attorney Hicks that Sally L. did not have her face reconstructed, asserting that "I know for a fact that she did." Id. at 48. The petitioner explained that the reason *he* wanted Sally L.'s medical records was because she had impaired mental function resulting from brain lesions caused by multiple sclerosis. Id. The petitioner asserted that he had had to "beg, plead, threaten" to get the motion to dismiss filed, and that the dates in the subpoena

15

for phone records were not right. Id. The petitioner stated, "This is becoming very difficult for me, to not be able to trust my lawyer." Id. at 48-49. The petitioner advised the court that he had no alternative but to file grievances with the Office of Lawyer Regulation against Attorney Hicks and the prosecutor, and he again asserted that he believed that both Attorney Hicks and the prosecutor needed to be removed from the case. Id. at 49.

In the letter the trial court received on October 2, 2012, the petitioner again asserted that he'd wanted Sally L.'s medical records only to prove that brain lesions impaired her mental functioning; he insisted that Sally L. was allergic to Hydrocodone and that she had gotten a prescription "for the express purpose of distribution." Id. at 50. The petitioner asserted—as he had in the earlier letter—that he picked up Sally L.'s prescriptions for her from Walgreen's and that he knew to whom she was distributing it. Id. He asserted that it was a "lie" for Attorney Hicks to assert in the motion that Sally L. did not have a prescription for Hydrocodone. Id. He reiterated that he'd never denied that Sally L. had undergone facial reconstruction, and he provided details about the injury that led to that surgery. Id. The petitioner asserted that Attorney Hicks had "clearly" been working against the petitioner's best interest in partnership with the prosecutor, and again insisted that "they must both be removed from this case." Id. at 51. The petitioner stated that that he was going to have his family start liquidating property to hire a lawyer for him, but that "[i]n the mean time I want to represent myself in this matter." Id. He stated that the only motion he felt "can be dealt with" was the motion to dismiss. Id.

16

f.    The October 4, 2012 motion hearing

The petitioner provided an excerpt of the transcript from the October 4, 2012[3] motion hearing. Id. at 74-76. The transcript excerpt reflects the following exchange:

THE COURT:              . . . There are also a number of handwritten letters that the Court has received from [the petitioner]; two addressed to me and one addressed to the Chief Judge[4]; but the Chief Judge, I think, would defer to my handling of those since it's actually my case.

                        So if these are construed as a request for a new lawyer, I deny it. If they are construed as a request to adjourn the trial, I deny it. I am happy to take any other information that either of the lawyers would like to make to this Court.

MS. MILLER:             Nothing.

MR. HICKS:              I don't think I need to, Judge. I expect to be ready for trial as scheduled.

THE COURT:              Okay, Anything from the State?

MS. MILLER:             No.

---

[3] The cover page the petitioner provided shows the date of the proceeding as October 5, 2012, although the docket reflects that the hearing took place on October 4, 2012.

[4] The petitioner provided the court with a letter he'd written to Milwaukee County Circuit Court Chief Judge Jeffrey Kremers; the petitioner dated the letter September 20, 2012 and the court's "received" stamp is dated September 26, 2012. Dkt. No. 23 at 45. In that letter, the petitioner accused Attorney Hicks and the prosecutor of unethical and illegal behavior and asked for the Chief Judge's help in getting both removed from his case. Id. He noted that he had asked to have Attorney Hicks removed once before and "was turned down." Id.

17

| THE COURT: | Our next court date then is November 1st at 8:30 for final pretrial. [The petitioner] will be produced. That will be the last date generally to accept plea negotiations although there are generally exceptions. |
| --- | --- |
| | Our jury trial is November 26th at 9:00. Thank you. |
| THE [PETITIONER]: | Am I allowed to address the Court at all, ma'am? |
| THE COURT: | No. You will allow your lawyer to do that. I think he's doing an excellent job and I am concerned that you would just end up jeopardizing the strength of your litigation position. |

Id. at 75-76. The docket remark indicates that the court denied the petitioner's motion to sever, denied the motion to dismiss as to Counts 1 and 3-6 but granted the motion as to Count 2, granted the state's other acts motion and allowed the state to use Count 2 as other acts evidence and denied the defendants "pro se motions to dismiss the case and withdrawal of counsel." Mason, Case No. 2012CF000228

> g.     Attorney Hicks's suspension

As it turned out, on September 27, 2012—after the September 10, 2012 hearing but before the October 4, 2012 hearing—the Wisconsin Supreme Court had ordered Attorney Hicks's license to practice law suspended. Dkt. No. 23 at 71. On October 5, 2012—the day after the hearing at which the court declined to allow the petitioner to speak—the court issued an order to show cause, requiring Attorney Hicks to appear and explain why he had appeared at the October 4, 2012 hearing when his license had been suspended. Id. at 72-73.

18

Attorney Hicks and the prosecutor appeared before the court on October 12, 2012; the petitioner was not present and Attorney Hicks waived the petitioner's appearance. Id. at 77-78. Attorney Hicks advised the court that when he had appeared at the October 4, 2012 hearing, he had not been aware that his license had been suspended. Id. at 78. The court asked Attorney Hicks if he was hopeful that his license would be reinstated soon; Attorney Hicks responded in the affirmative. Id. at 79. The court stated that it was "comfortable just kind of getting in a holding pattern," and suggested a status conference the following week. Id. The court advised Attorney Hicks that if he was not reinstated by the next hearing, the court would "have to get a new lawyer on it," and asked Attorney Hicks to talk to the petitioner "about this." Id.

h.    The petitioner's next request to represent himself

The docket indicates that on October 11, 2012, the court received another letter from the petitioner. Mason, Case No. 2012CF000228. The petitioner provided a copy of the letter, which he'd dated October 5, 2012. Dkt. No. 23 at 52. The petitioner told the court that he wanted Attorney Hicks to "do his job," but that the petitioner did not believe that Hicks would do so; the petitioner stated, "[t]hat is why I want to represent myself this is my right this is the only way all the witnesses will be at trial." Id. He advised the court that he'd seen no evidence that the "top witnesses" in the case had been interviewed. Id. He concluded the letter by saying, "[g]rievances were not filed in this case against Mr. Hicks and [the prosecutor] for nothing there was cause." Id. at 53.

19

i.      Attorney Hicks's reinstatement

The state court docket reflects that there was another hearing on October 12, 2012 (the day after the court received the above letter); the petitioner again was not in court, but Attorney Hicks appears to have again represented that he was hopeful that he would be reinstated. Mason, Case No. 2012CF000228. The court set another status conference for October 18, 2012. Id. Attorney Hicks appeared at the October 18, 2012 hearing before the court; again, the petitioner was not present. Mason, Case No. 2012CF000228. The docket note indicates that Attorney Hicks had been reinstated and that the case was adjourned for a final pretrial. Id. Eventually, at a November 2, 2012 adjourned hearing off the record, the court set a final pretrial for November 20, 2012. Id.

j.      Attorney Hicks's motion to withdraw

Between November 6 and November 19, 2012, the court received from the petitioner himself two motions to substitute the judge, two motions to dismiss the charges and a motion to dismiss attorney. Id. On November 20, 2012—the date scheduled for the final pretrial conference—the court received from Attorney Hicks a motion to withdraw as counsel. Id. The petitioner provided a transcript of the November 20, 2012 final pretrial hearing. Dkt. No. 23 at 80.[5] The transcript indicates that the court had received a motion for

_____

[5] The cover page bears two case numbers—2012CF000228 and 2012CF000229 (possession of marijuana). Dkt. No. 23 at 80. The reference to Case No. 2012CF000229 is a mystery; the court searched the Wisconsin Circuit Court Access Program and could not find any case in Milwaukee County Circuit Court with that case number. Although the petitioner has been a party in

20

joinder of another case, as well as a motion from Mr. Hicks to withdraw as counsel in Case No. 2012CF000228. Id. at 81. The court asked Attorney Hicks for more information on the motion to withdraw. Id. Attorney Hicks responded:

> Sure. The Court is obviously aware of the history of the case and the letter Mr. Mason has written. What prompted me to file a motion was I tried to meet with him last night at the House of Correction, and he refused to meet with me. So we're not talking at all, and that makes it awfully hard to represent him and push forward. He's asked me to be removed off the case as well, and the Court knew about that already. So we have no communication at this point I time and that also hampers my ability to represent him effectively at this point.

Id. at 81-82.

This prompted the court to "review the record a little bit in terms of counsel in this case for everyone's benefit." Id. at 82. The court stated the following:

> . . . Mr. Hicks was appointed on or about May 15th, 2012. He hasbeen working on this case ever since and has filed multiple briefs that were very well-researched, drafted, and argued.
>
> Prior to that, Attorney Jeff Wilson was the attorney assigned by the Public Defender's Office. On May 7th, he informed the Court that there was a lack of communication between the Defendant and himself, and Judge Rebecca Dallet granted the motion for a different attorney to be assigned.
>
> At the initial appearance, attorney Mary Garvin Guimont appeared, but I think she was just the staff attorney that appeared for that hearing on January 15th, 2012. So, basically, Mr. Hicks is the second attorney on this case. This is a very old case. It's basically 11 months old almost at this point. It's been set for jury trial—this is the third time it's been set for jury trial.
>
> The September trial was vacated because of the extensive motions filed by Mr. Hicks on [the petitioner's] behalf that, while not all granted, were certainly substantive enough that we weren't going to

---

several cases, the court could not find a case against him with that case number.

be able to keep that trial date. The May 7th jury trial date would have been vacated as a result of the prior communications breakdown.

We obviously have a trial set for Monday in this case. And I, frankly, have some significant concerns that this refusal to speak with his lawyer is just an effort on [the petitioner's] part to thwart the efficient administration of justice, to delay or thwart the ability of the Court to address these—the allegations in this case on the merits.

[The petitioner] doesn't control these proceedings; I do. And I realize, Mr. Hicks, it makes it hard for you to represent him if he won't meet with you. On the other hand it's clear from the Court from the briefing that you've submitted that you're very much on top of the discovery. I see you've got your binder in front of you. It's well-organized. It's obviously thoroughly tabbed, and obviously will be helpful in your trial prep, and I'm sure has already been helpful.

The Court receives communication after communication from the [petitioner], seeking to dismiss the charges, seeking—I know he's written to the Court of Appeals—seeking to appeal. There's no right to appeal.

I just really have the impression that [the petitioner] is doing everything in his power to thwart the system of justice from getting to its ultimate goal, which is ascertaining the truth and either providing [the petitioner] with acquittals, if that's what he's entitled to, or convictions, if that's what the evidence supports.

[The petitioner] has the right to due process. The victim also has the right under the victim's rights statute for a speedy resolution of these matters. We are nowhere near speedy at this juncture.

The people of the State of Wisconsin also have a right for an efficient and timely disposition of these cases or of these allegations. Evidence becomes stale, witnesses forget, the ability of the State to effectively prosecute can be hampered by the passage of time.

So as you can probably tell from my comments, I'm not inclined to grant the motion. I don't know, [Assistant District Attorney] Ms. Karshen, if you have anything you would like to add?

Id. at 82-85.

After the prosecutor opined that the petitioner was "doing this as a delay tactic" and took umbrage at the petitioner's allegations that she was conspiring with Attorney Hicks, she told the court that she thought it was the petitioner's goal "to not get along with any attorney that the Public Defender would appoint." Id. at 85. Attorney Hicks having nothing to add, the court ruled as follows:

> I deny the motion. I reviewed the many handwritten motions filed by [the petitioner]. They request dismissal, dismissal of the attorney, substitution of judge. I'm not granting any of them. [The petitioner] does not have the right to substitute on this judge at this juncture procedurally. I've just denied the motion to dismiss counsel. I obviously have no authority to actually dismiss the charges. That's not my job. That's the prosecutor's job. It's my job to provide the forum for the trial of these matters.

Id. at 82-85.

### k. The jury trial

On the morning of November 26, 2012—the first day of the petitioner's trial—the court met with the parties outside the presence of the jury. Dkt. No. 18-10. When the court noticed that the petitioner was not in civilian clothing and asked if he had any, the petitioner responded, "I don't have clothes. I would just rather sit in the bullpen. You guys can run it without me." Id. at 3. The bailiff volunteered that the petitioner's jury clothes were available but that he'd refused to put them on; the petitioner confirmed that. Id. The court told the petitioner that he had a constitutional right to be present at every stage of his trial, and that while he might be able to hear what was going on, he would not be able to communicate with his lawyer except at breaks. Id. at 3-4. The petitioner confirmed that he understood. Id. at 4. The court asked whether the

petitioner understood that the court would "have to tell the jury that [the petitioner chose] not to come into the courtroom for [his] own trial." Id. at 4. The petitioner confirmed that he understood. Id. The court told the petitioner that although it would tell the jury that the petitioner's absence could not affect their verdict, "they are likely to think it's odd, and, you know, it's not going to— it potentially may not [i]nure to your benefit. Do you understand that?" Id. The petitioner responded that he understood. Id.

When the court asked Attorney Hicks if he'd met with the petitioner since "last we met" to prepare for trial, Attorney Hicks responded that he'd been out of town for the holidays and that because he believed the petitioner did not want to talk to him, he'd "just prepared the case." Id. at 4-5. The court then turned back to the petitioner:

| | |
|---|---|
| THE COURT: | Okay. So, [petitioner], Mr. Hicks is your appointed attorney, and it sounds like he is prepared to try this case on your behalf. Are you willing to allow him to do that? |
| [THE PETITIONER]: | No, because I—I don't want him to represent me. |
| THE COURT: | Okay. And I know I denied your motion last time. You have some options here. You could instruct him that he has to sit like a lump in the courtroom, and he would have to follow those instructions. You would be completely giving up any opportunity for the defense to do anything on your behalf, and certainly that would not be to your benefit. Do you want him in fact to try the case on your behalf? |
| [THE PETITIONER]: | None of my objectives have been met in this case. I wanted the Other Acts motion appealed. That wasn't done. I prefer to |

24

|                     | represent myself. I mean it's plain to see [Sally L.] committed perjury for me to be arrested with a criminal act. The police made it up. I never threw her in the truck by the neck. You know, these things are what should be brought up at a trial for the jury to hear. |
|---------------------|---|
| THE COURT:          | Well, sir, it's clear that you are literate. You have filed plenty of pleadings with the Court. How far did you go in school? |
| [THE PETITIONER]:   | I went to school for college for electronic engineering. I'm a certified welder. My reading, I tested in 2000. It was off the charts. |
| THE COURT:          | Okay. And the issue that I have had with your self-representation is your ability to communicate in the courtroom and a psychological inability to communicate in the courtroom. Throughout this case you have shown that you don't understand legal proceedings. You don't have a right to an appeal on the Other Acts motion at this point. |
|                     | But that's not really the standard. I mean you don't have to be a legal expert to represent yourself. My concern with your competency has always been basically your ability to communicate in the courtroom. You have always been extremely difficult. You have been disruptive. You have been disrespectful. You have been off is the best way I can describe it. |
|                     | I don't have any concerns about your competency to stand trial. Clearly you understand the proceedings, you are able to help your lawyer if you are willing to do so. But that's the reason that I denied your right to represent yourself. I have serious considerations about your ability to communicate in a courtroom. |

25

|  | And, you know, I—you have a constitutional right to represent yourself. You don't have a constitutional right if you are not competent to do so. And in Wisconsin that's a heightened standard over just basic competency, and I continue to believe that you are not competent to represent yourself, which is why I have denied your request to do so. |
| | |
| | So, you know, basically you've got to decide at this point what you are going to have Mr. Hicks do on your behalf. |
| [THE PETITIONER]: | I just assume [*sic*] leave it to the appeals court. You guys do what you want to do, and then let the chips fall where they be later on. |
| THE COURT: | And are you then instructing him not to do anything on your behalf? Or will you allow him to do what he has prepared to do? |
| [THE PETITIONER]: | I would prefer him not to represent me. I mean I'm innocent of these charges. That's why I'm being difficult. That's why I'm putting up such a struggle. I'm innocent of these charges. My father's on his last leg. He's dying. And I'm in here. [Sally L.] knows this. I didn't do these charges. |
| | Look at the charges. This lady said that this happened in 2006. Then she says it didn't happen. Her word is not viable. Jeffrey Wilson didn't represent me in the preliminary. I don't believe it should have made it past preliminary. |
| THE COURT: | Well, understanding that you would prefer not to have Mr. Hicks as your lawyer, he is your lawyer. And so the question is what do you want him to do for you today and this week at this trial? |
| [THE PETITIONER]: | I'd like him to step down from my case. |

26

| THE COURT: | Well, but then you would have no one to represent you, and you are entitled to have representation. |
|---|---|
| [THE PETITIONER]: | I think with this case the evidence speaks for itself. I wouldn't have to speak. I can be allowed to bring evidence in. Let me bring in Shannon Gray to say that I didn't throw her into my truck. I didn't have to. [Sally L.] testified to that at the preliminary hearing. |
| THE COURT: | You still haven't answered the question. Mr. Hicks is your lawyer. He is prepared to present a defense for you today. You can either instruct him to sit like a lump, or you can allow him to go forward. What is your choice? |
| [THE PETITIONER]: | I don't know. You know, he's shown that he's not—he's not—He didn't put his heart into it, I guess. |
| THE COURT: | What is your choice, [petitioner]? |
| [THE PETITIONER]: | Let him do what he wants to do, I guess. |

Id. at 5-9.

After some discussion with counsel about scheduling issues, the court

stated:

> And I'll tell you what I'm going to do procedurally. I am going to bring [the petitioner] back out at the next time, and I am going to confirm that he still wants to be absent. I am going to do that throughout the trial, periodically, outside the presence of the jury. After every single direct examination, Mr. Hicks, we are going to break and I am going to allow you to go into the bullpen and ask him if there are any questions he wants you to ask.

> [The petitioner] can talk to you or not, but he should know and you should know and the State should know that throughout this trial I am going to be repeatedly offering [the petitioner] the opportunity to change his mind. I am going to be repeatedly offering him ample opportunities to contribute to his trial in any way that he wants to.

27

> Ultimately these decisions will rest with him, but we will be making sure that happens throughout the trial.
>
> I'm going to do my best to give [the petitioner] the fairest trial I can give. He may make choices that are not to his advantage, and he's free to do that, but it's my job to continue with that process.

Id. at 10-11.

When the parties returned to the courtroom after a break, the court asked the petitioner whether he'd changed his mind about whether he wanted to be in the courtroom for trial. Dkt. No. 18-11 at 7. The petitioner responded that he had not changed his mind, stating

> No. I'm not going to participate because the main evidence, the only thing that could track this whole case, are phone records, and he doesn't have them, and he's been on this case for five months. Two of the witnesses are dead and one of them can't be found. The only way that this case can truly be tried is by those phone records.

Id. at 7-8. Attorney Hicks advised the court that he'd spoke with the petitioner, and made some arguments about evidence the petitioner had mentioned to him. Id. at 8-9. Attorney Hicks indicated that he'd received phone records six weeks earlier, but they were the wrong records, so he returned them and asked for the right ones but never had received them. Id. at 8-9. He stated that he did not mention it earlier because the petitioner had stopped cooperating and that he did not have the records in court. Id. at 9.

Before removing the petitioner from the courtroom and bringing in the jury, the following colloquy occurred:

THE COURT:        All right. Then, I think our jury is in the hall. So, [petitioner], we are going to remove you from the courtroom. And just so you know, this is what I'm going to tell the jury, and your lawyer has already had input on

28

it. I'm going to tell them that, "The Defendant in this case has chosen not to be present in the courtroom during this trial. He is present in the courthouse and the sound from the courtroom is being piped into the room where he is located. The Defendant has the right to choose not to be present in the courtroom. The Defendant's decision not to be present must not be considered by you in any way and must not influence your verdict in any manner."

Does that change your decision at all, sir?

THE [PETITIONER]:     No. I just would have—just one final question for you . . .

THE COURT:            Yes?

THE [PETITIONER]:     [Sally L.] is saying that I terrorized her, where she called me, even when she had a restraining order, hundreds of times, and now how would that not be important for the jury to see?

THE COURT:            It's actually very common. I can't say whether it would have ultimately been admissible because I haven't heard the rest of the trial. And, Mr. Hicks, if you think it's something we need to continue to address as the case unfolds, you can let me know.

Id. at 10-11.

The following morning, the petitioner was in the courtroom first thing.

The court asked him whether he wanted to be in the courtroom. Dkt. No. 18-12

at 3. The following exchange occurred:

THE [PETITIONER]:     There's been some dramatic developments in this case. One of the witnesses I had on my witness list, Mr. Hicks called, and she's deceased. She lived a block away from [Sally L.]. I called her daughter last night to wish her condolences, and I asked her how

29

|  |  |
|---|---|
|  | her mother died. Her mother died of an overdose of Vicodin. [Sally L.] was her supplier of Vicodin. Her daughter had went to [Sally L.'s] house, was given a package, she took it back to her mother's. The next day she found her mother dead in bed. |
| THE COURT: | The question, [petitioner], was whether you want to be in the courtroom. |
| THE [PETITIONER]: | No, I don't want him representing me at all. I don't want to come in. I'm asking you again for the substitution under 971.20. And if it's turned down, I don't believe you have the authority to act in this manner, and I want to go to Appeals Court. |
| THE COURT: | Okay. So addressing those in reverse order, you don't have any right of substitution, and I would deny that request. |
| THE [PETITIONER]: | Under prejudice. |
| THE COURT: | In terms of an appeal, there's no right to appeal of that issue at this juncture. In terms of Mr. Hicks representing you— |
| THE [PETITIONER]: | I don't want him questioning anybody or anything. |

Id. at 3-4.

After reviewing relevant caselaw, the court concluded that the petitioner could order Attorney Hicks to do nothing. Id. at 4-6. She asked the petitioner whether he understood that an instruction to Attorney Hicks to do nothing would be "extraordinarily" and "extremely" "prejudicial" to him; the petitioner stated that he did. Id. at 6-7. The court asked the petitioner whether he understood that she was going to have to tell the jury that he'd instructed his lawyer to do nothing, "because otherwise they're going to wonder what the heck

30

is going on, and that probably will also be prejudicial to you." Id. The petitioner said he understood that. Id. at 7. The court confirmed that the petitioner was making this decision against Attorney Hicks's advice; Attorney Hicks said he'd not had the ability to talk with the petitioner that day. Id. at 7-8. The court asked Attorney Hicks whether he'd like to confer privately with the petitioner; before Attorney Hicks had an opportunity to ask the petitioner about that, the petitioner held up his hands and shook his head, asserting that Attorney Hicks had been "ineffective from the moment he was appointed" and stating that he did not want to talk to Attorney Hicks "at all." Id. at 8. The court then made a record:

|  |  |
|---|---|
| THE COURT: | All right. So, for the record, [petitioner], it's clear your lawyer thinks you're acting in a way that's not in your best interest, and he would recommend that you both allow him to advocate on your behalf and allow—or choose to be in the courtroom. Do you understand you're acting against his advice? |
| THE [PETITIONER]: | He's worked against my best interest from the beginning of this case. |
| THE COURT: | Answer the question, [petitioner]. Do you understand you're acting against his advice? Record should reflect the [petitioner] is refusing to answer the question.<br><br>Anyone who reads this record, I think, will realize that none of these decisions are in [the petitioner's] best interest. But they are his decisions to make, and I can't change his mind, Mr. Hicks can't change his mind.<br><br>So we are just going to proceed in the manner [the petitioner] has decided we will |

31

proceed, which is to say he will be in the back. The sound will be piped in. He will hear what's going on. I will bring him out periodically throughout the trial to make sure this is still how he wants to proceed. I will send [the petitioner] in to see if Mr.—strike that, Mr. Hicks in to see if [the petitioner] would like to give him any input at all or change his position.

Throughout the trial, I'm going to give [the petitioner] plenty of opportunities to reconsider. [Petitioner], you should know that once you dig this hole, it's going to be hard to get out of it. Because I'm going to have to tell the jury what's going on, and then if you change your mind—don't interrupt me—I'm going to have to tell them, well, now he's changed his mind and here is [the petitioner] who has made all these really irrational decisions. I mean, I won't say it like that, but that's what the jury is going to be thinking. Do you understand you're digging yourself a hole that's going to be very hard to get out of?

THE [PETITIONER]:     He's worked in partnership with the D.A. from the beginning.

THE COURT:     Do you understand that you're digging yourself a hole that's going to be—

THE [PETITIONER]:     I've been in a hole when you wouldn't take this man off my case.

THE COURT:     Okay. All right. Anything else that either lawyer thinks I need to address on the record at this juncture?

Id. at 8-10.

Attorney Hicks asked the court to have the prosecutor put the most recent plea offer on the record. Id. at 10-11. The prosecutor did so. Id. at 11-12. The court inquired whether there was anything the petitioner did not

32

understand about the offer. Id. at 12. The petitioner answered "no." Id. The court asked if the petitioner wished to accept the offer; the petitioner responded, "I would be lying if I did." Id.

After the petitioner had been returned to the bullpen, the court asked if either of the lawyers knew anything about the deceased defense witness. Id. at 13. Attorney Hicks explained that he was "the one who told [the petitioner] that yesterday afternoon," and that Attorney Hicks had "learned about it from [his] investigator." Id. He explained that the witness was a neighbor of Sally L.'s whom the petitioner wanted Attorney Hicks to call to testify that she had had frequent contact with the petitioner and Sally L. and that everything had "seemed fine" with them. Id. at 13-14. Attorney Hicks explained that while the witness's daughter had told the investigator that the witness had died "last April," the investigator didn't mention the cause of death in her report. Id. at 14-15. Attorney Hicks said that he had been planning to call the witness's daughter, who also would have been able to say that while she didn't see the petitioner and Sally L. together as often, things seemed fine. Id. at 14. The court speculated that it might not even have allowed such evidence to be admitted. Id. at 15.

The court then referenced the issue of the deceased witness in further discussing the petitioner's competency to represent himself:

> I would note that it is another factor that the Court considers in terms of the [petitioner's] competency to represent himself. This is the pattern that I've seen from the [petitioner]. It's almost like he's not really connected to reality.

33

I mean he's—again, I don't have any concerns about his competency to stand trial. He clearly understands the proceedings. He clearly could communicate with Mr. Hicks if he chose to. He's able to communicate with the Court. He understands the allegations, but I—again, there is something that is very concerning to the Court in terms of his capacity to communicate with the jurors and his psychological capacity in that regard that I continue to believe he's not competent to represent himself.

Id. at 16. The prosecutor then made a record that as she "was trying to leave the secure part of the courtroom, the [petitioner] did say to [her], 'Go say hi to your murdering friends.'" Id. The court continued:

| | |
|---|---|
| THE COURT: | Yeah. I mean, he's very—you know, he's very troublesome and difficult. And obviously that's obvious from the choices he's making that are not really helpful to him at all, but— |
| MR. HICKS: | I guess I should make a record on his legal competency to stand trial, Judge. I had considered that previously. I did not raise it because I was able to speak with [the petitioner] for a couple of hours at the House of Correction calmly and lucidly. That was, again, yesterday. |
| | It is something like when he wants to talk to me, he can. His reactions are, like you say, it's almost I don't want to say bipolar because I'm not a professional and I don't know it, but saying things like that to [the prosecutor] and calling me a devil and accusing me of these conspiratorial things are a bit troubling. I don't know if its legal competency or not, if he should be evaluated or not. It's a concern. |
| THE COURT: | Yeah. I don't have any—do you have any serious concerns about his competency to understand the proceedings and to assist you, should he choose to do so? |

34

| | |
|---|---|
| MR. HICKS: | It's mainly to assist me. I think he understands what's going on, he knows the facts in this case, but then he gets, what I've described as almost paranoid, like, there's no reason to react this way, to the death of this witness, that those things happened. I have a replacement. |
| THE COURT: | Don't you believe that if he chose to communicate with you, he would be able to assist you? |
| MR. HICKS: | Yeah, I do think so. |
| THE COURT: | I mean, historically, he has done so, right? |
| MR. HICKS: | He was actually doing it in court a couple times yesterday. When he wanted to talk, he did talk. |
| THE COURT: | Right, right. |
| [THE PROSECUTOR]: | He's also, based on what he told, provided Counsel with information of witnesses, the phone records. So, the [petitioner], from my experience in the court, if he chose to assist his attorney, based on what he's written to the Court, based on what he said in court— obviously, I'm not a party to a conversation, and despite his theory, I'm not working with Mr. Hicks—but based on what I've observed of the [petitioner], if he chose to, he's very able to help in his defense. He might get fixated on certain things, but he's very able to assist his attorney. He's just choosing not to. |
| THE COURT: | Yeah. I think the ability to understand and assist the attorney is a different question then [*sic*] competency to represent oneself. And as I noted yesterday, the standard for the latter in Wisconsin is not the same as the former. It's slightly higher.

And I have, you know—obviously he has a level of education and probably innate |

35

> intelligence and, certainly, an ability to communicate, both orally and in writing, that would probably meet the threshold, but in terms of his ability to communicate with jurors and the psychological aspects of that task, I just—I have very serious concerns. And I, again, find he is not competent to represent himself.

Id. at 16-19.

Before the court brought the jury in for *voir dire*, Attorney Hicks reiterated that the petitioner had told him "in no uncertain terms, first, not to talk to him at all myself. He also said don't do anything on his behalf. Don't talk to anyone. Do nothing. Those were his last words." Id. at 20.

When the time came for the parties to exercise their strikes in selecting the jury, the court paused to allow Attorney Hicks to ask the petitioner if the petitioner wanted Attorney Hicks to exercise strikes for cause on the petitioner's behalf. Id. at 28-29. Upon his return, Attorney Hicks told the court, "[The petitioner] is maintaining his instructions for me to do absolutely nothing in this case." Id. at 30. The court and the prosecutor came up with an instruction to give to the jury:

> THE COURT: Any words missing—oh, Mr. Hicks, I can't even ask you. I'm sorry. This is such a strange posture.
>
> I will read it into the record, and I think it's accurate. It says, "In addition, the Defendant has now instructed his lawyer, Mr. Hicks, to sit mute during this trial—his trial. He has instructed him to do nothing. The Defendant has a right to instruct his lawyer to do nothing, and his decision to do so must not be considered by you in any way and must not influence your verdict in any manner. I remind you that the State has the burden of proof beyond a reasonable doubt, and

36

> the Defense is under no obligation to put on a
> case at all."

Id. at 32-33. The prosecutor suggested that the court go further and tell the

jury that the petitioner had instructed Attorney Hicks not to question

witnesses and not to put on a defense. Id. at 33. The prosecutor also

suggested adding the presumption of innocence. Id. at 34. The court later

concluded that it also should advise the jury that it could not hold the

decisions of the petitioner against the state. Id. at 38.

Later that day, after another break, Attorney Hicks made another record:

| MR. HICKS: | Attorney Mike Hicks appears. [The petitioner] is not present. He is in the bullpen. I did confer with him before going on the record. He is not going to come to court now. |
| --- | --- |
| | I do have one other thing, Judge, I want to talk about the side bar on the record first. It relates, again, to his legal competency. I have a growing concern. I made my feelings evident earlier. I actually asked [the petitioner] if he would agree to an evaluation, and he said he would. I was just wondering if this might be the kind of case worth having an evaluation? |
| THE COURT: | I do not believe there is any reason to question his competency. I mean, you can tell me if you see something I don't see. Honestly, I think, at this point, it's just another effort on his part to not have this trial go forward today. I mean, he hasn't shown any signs throughout the life of this case and interacting with you that gave you concern for competency, correct? |
| MR. HICKS: | Correct, Judge. I don't see any profound mental illness. The only thing is what you've seen in court and when he submits to the COURT is this sort of paranoid reaction to the evidence that seems to be somewhat irrational. Again, it is also |

37

the case that when he wants to be calm and talk, he can.

THE COURT:     Yeah. I mean the standard for incompetency to stand trial is very low, really. And it is only—is he capable of understanding the proceedings, clearly, he understands them. He doesn't understand the procedure necessarily. He doesn't understand when he has a right to appeal, but he understands the charges. He understands the process of a trial. He understands that if he would plead guilty, he would be, quote, "lying." He understands what pleading guilty means, based on that comment. And, historically, he has been effective in communicating with you and assisting in his defense.

I think this is all, frankly, about power and control on [the petitioner's] part, and I think he'll do anything to thwart having this process on the merits. And while I appreciate your diligence and so forth, I do not see any grounds to delay this trial for a competency exam. I just don't. I mean, there's no evidence of it. There's no history of it. So I would decline.

Id. at 40-42.

After lunch on the 27th of November, the court again had the petitioner

brought to the courtroom. The following exchange occurred:

THE COURT:     All right. Good afternoon, Ms. Karshen, Mr. Hicks, and Mr. Mason. At this time do you wish to reconsider your decision to have Mr. Hicks do nothing about your trial?

[THE PETITIONER]:     I want him to do nothing.

THE COURT:     And do you wish to reconsider the decision whether you're going to be in the courtroom?

[THE PETITIONER]:     No.

38

| THE COURT: | So is it correct, then, that you do not want him to make an opening statement? |
|---|---|
| [THE PETITIONER]: | I don't want him to make any statements for me. |

Dkt. No. 18-13 at 3. The court had the petitioner returned to the bullpen. Id. at 4.

At the close of the prosecutor's direct examination of Sally L., the court asked Attorney Hicks to check in with the petitioner. Id. at 64. Attorney Hicks did so, and reported that the petitioner wanted him to ask Sally L. three questions. Id. at 64-65. The state objected to one of the questions; the court sustained that objection but agreed that Attorney Hicks could ask the other two. Id. at 65. After discussion with the prosecutor, the court gave the jury the following instruction:

> So, ladies and gentlemen of the jury, I would let you know that throughout this trial I'm periodically checking in with [the petitioner], as is his lawyer. I want to give him every opportunity to participate in this trial to the extent that he wishes to do so. I just did that, or I should say Mr. Hicks just did that, and he has been authorized to ask [Sally L.] two questions. So that's what we are going to proceed with next. Go ahead, Mr. Hicks.

Id. at 68.

After the testimony of Shannon Gray, Attorney Hicks conferred with the petitioner and was instructed to ask no questions. Id. at 78. After the testimony of Jamie Hardy, the petitioner instructed Attorney Hicks to ask one question, which the court allowed. Id. at 86-87. After the testimony of Yvonne Echols, the petitioner instructed Attorney Hicks not to ask any questions. Id. at 94. At the request of the prosecutor, the court had the petitioner brought into

39

the courtroom to ask whether he would stipulate to being the person in the truck on January 10, 2012 at Guaranty Bank. Id. at 94-95. The petitioner responded that it was not in dispute that he was that person. Id. at 95. The court then inquired about the petitioner's ability to hear what was going on in the courtroom; during this conversation, the court also asked the petitioner whether he wanted to reconsider his decision to ask his lawyer to do "mostly nothing." Id. at 95-96. The petitioner responded that he wanted Attorney Hicks to present two witnesses—a security guard and the petitioner's sister—and to move into evidence two postcards from Sally L. Id. at 96. He reiterated, however, that he did not want to be in the courtroom. Id.

The morning of the third day of trial, November 28, 2012, the petitioner appeared in the courtroom in civilian clothing. Dkt. No. 18-14 at 5. When the court asked whether he had decided that he wanted to participate in the trial, he responded, "Yes." Id. The court asked the petitioner what his instructions were for Attorney Hicks, asking, "Can he go ahead and try the case?" Id. The petitioner responded, "Go ahead and try it." Id. When the jury was present, the court told them:

> You would note [the petitioner] is present in the courtroom. He has decided to participate in the trial, and he has instructed his lawyer that he may defend him. So we're just going to move forward in that posture.

Id. at 14. The trial proceeded in a more routine fashion from then on. The state rested later that day. Id. at 108. Attorney Hicks called several defense witnesses—George Breitrick, a security guard at Guaranty Bank, id. at 108-20; Nicholas Zurheide, who had lived with Sally L. for a time and knew the

petitioner, id. at 120-28; Calvin Ivory, a neighbor of the petitioner's, id. at 132-40; Joan Mason, the petitioner's sister, id. at 141-51; Jessica Willborn, the daughter of the deceased neighbor whom the petitioner had wanted to call as a witness, id. at 151-60; Joel Mason, the defendant's father, id. at 160-71; and Arielle Mason, the petitioner's niece by marriage, id. at 175-83.

On the fourth day of trial, the petitioner testified. Dkt. No. 18-15 at 3, 11-59.

On November 30, 2012, the jury found the petitioner guilty of two counts of third-degree sexual assault and three counts[6] of substantial battery. Dkt. Nos. 18-1 at 2; 18-16 at 4-5.

### l.    The sentencing

Two months later, Judge Brostrom presided over the sentencing hearing. Dkt. No. 18-17. Almost immediately, Attorney Hicks informed the court that the petitioner had declined to review the presentence investigation report or discuss the case with Attorney Hicks. Id. at 2-3. The court noted that the petitioner had refused to speak with the presentence writer. Id. at 3. The court explained that it had received a number of "handwritten motions" from the plaintiff; it asserted that they were "legally not effective" and that it did not plan to address them. Id. The court then explained that she had heard from sheriff's deputies that when Attorney Hicks was meeting with the petitioner, "there was some physical interaction" between Attorney Hicks and the petitioner. Id. at 4. The court asked whether Attorney Hicks was comfortable putting that on the

---

[6] "One count of substantial battery was dismissed on [the petitioner's] motion." Dkt. No. 18-2 at 2 n.1.

record. Id. Attorney Hicks responded that when he'd met with the petitioner over the lunch hour, the petitioner had not wanted to meet with him and had started yelling and screaming at Attorney Hicks; Attorney Hicks reported that while the petitioner had gotten "rather close," he had not made contact with Attorney Hicks and never had in the past. Id. Attorney Hicks explained, however, that he believed that the petitioner did not want him to say or do anything at the sentencing. Id. at 5. The court then held a colloquy with the petitioner:

| | |
|---|---|
| THE COURT: | Is that correct, [petitioner], you do not want Mr. Hicks to say anything on your behalf today? |
| THE [PETITIONER]: | I wrote those motions because he wouldn't write them. You're saying that you won't respond. For me to have these issues on appeal, they have to be addressed by this court. Anything not brought up in circuit court cannot be appealed upon. My rights are clearly being violated over and over. |
| THE COURT: | The question for today is do you want him to— |
| THE [PETITIONER]: | You let him represent me with a suspended license. |
| THE COURT: | Do you want him to say anything today, was the question? |
| THE [PETITIONER]: | No. I never did. |
| THE COURT: | Okay. All right. |

Id.

The court gave the petitioner the opportunity to make an allocution; he took that opportunity:

THE [PETITIONER]: I mean, it's the other charges. I hope you people are happy. You violated all of my rights. [Sally L.] lied. Every one of those charges, you can lock me up for the rest of my life. It doesn't mean I'm guilty. I'm innocent. I hope you people are happy.

Id. at 9.

When it came time for the court to address the petitioner and to impose sentence, the following exchange occurred:

THE COURT: Your behavior in this courtroom has been power and control to the max, to the point of paranoia, to the point of my finding you not competent to represent yourself, not capable of communicating with a jury, not capable of assuming that role for yourself.

I don't think that it rises to the level of a true mental health issue or lack of competency to stand trial. You're obviously very intelligent, but the level of paranoia and delusions on your part about what's true and what's not true, about who's right and who's wrong, who's good and who's bad, and whose rights have been violated, is legion.

[Sally L.'s] rights have been violated in the most profound, disgusting, traumatizing, violative nature that can be imagined. And throughout this whole process, you have done everything you could to not have a day of reckoning occur. "Let me try to get rid of the lawyer. Let me way he can't do anything on my behalf at trial. Let me not come out of my—

THE [PETITIONER]: He didn't have a license.

THE COURT: "Let me file multiple, multiple motions with the Court that have no basis in the law."

43

|  |  |
|---|---|
|  | I dealt with the issue of his licensure. And so has— |
| THE [PETITIONER]: | He was supposed to notify me. I was supposed to get another attorney. |
| THE COURT: | There was no need for another attorney. The suspension was brief. I ordered Mr. Hicks to show cause. He addressed the issue with the Office of Lawyer Regulation. |
| THE [PETITIONER]: | How come you guys kept it a secret from me, then? |
| THE COURT: | And he—I don't believe it was kept a secret from you, Mr. Mason. And he did—he took no acts that involve strategy or motions or legal argument or anything. He appeared once when he shouldn't have. Not realizing, in fact, he had been suspended. But there was no legal effect to that appearance, and it didn't prejudice the Defendant in any way. And, then, he resolved it, and we moved on, and he continued in what had been a very— |
| THE [PETITIONER]: | I have a right to be represented. I wasn't represented. |
| THE COURT: | Mr. Mason, you can stop the power and control. It's my turn. |
| THE [PETITIONER]: | This isn't power and control. You're railroading me. |
| THE COURT: | This is my courtroom, my proceedings. It's my job to apply the law. |
| THE [PETITIONER]: | Why don't you do your job like you took an oath to do. |
| THE COURT: | It's my turn to speak. So the power and control, I mean, it continues here. I mean, it just goes on and on. |

44

> Frankly, I don't have any faith that [the petitioner] can be rehabilitated. I really don't. And, in fact, I think the State's recommendation is quite low. I think the only safe place for [the petitioner] is prison.
>
> He can't get along with his lawyer. He is threatening to him. He was unbelievably violent with [Sally L.] who was incredibly frail and disabled but for those bank employees.

THE [PETITIONER]: How come she had all those police contacts and there was never a scratch on her, then? Answer that.

Id. at 10-13.

The court imposed sentence—five years' initial confinement on Count 1, three years' initial confinement on Count 3, five years' initial confinement on Count 4, three years' initial confinement on Count 5 and three years' initial confinement on Count 6, to be served consecutively to each other, for a total initial confinement term of nineteen years, followed by nineteen years of extended supervision. Id. at 15; Dkt. No. 18-1 at 2. The clerk entered judgment five days later. Dkt. No. 18-1 at 1.

2. *Postconviction motion*

On September 8, 2015, the petitioner filed a Wis. Stat. §809.30 postconviction for a new trial. Dkt. No. 1-1 at 10. The petitioner asserted that the court had violated his federal and state constitutional rights to represent himself, that his trial counsel provided ineffective assistance and that the court was biased because it would not allow him to represent himself, would not allow him to be heard regarding Sally L.'s medical records, would not allow

45

Attorney Hicks to withdraw as counsel, allowed Attorney Hicks to waive the petitioner's presence in court when Attorney Hicks was practicing law without a license, allowed hearsay testimony by witness Shannon Gray and erroneously admitted Sally L.'s medical records. Id. at 10-12.

On September 15, 2015, the circuit court denied the motion. Id. at 10-12. As to the petitioner's claim that the court denied him his constitutional right to represent himself, the court stated that "[t]he record is replete with the court's reasons for rejecting [the petitioner's] bid to represent himself at trial," id. at 10-11, and that the court "[stood] by those reasons and denie[d] [the petitioner's] request for a retrial on this basis," id. at 11. The court characterized the defendant's ineffective assistance of counsel claim as a claim that Attorney Hicks had a conflict of interest and that his license had been suspended. Id. at 11. The conflict of interest claim, the court observed, involved "a variety of issues":—the fact that the petitioner had made a complaint against Attorney Hicks to the Office of Lawyer Regulation, the petitioner's perception that Attorney Hicks was not cooperative in filing pretrial motions the petitioner wanted filed and the petitioner's description of Attorney Hicks's motion to compel production of Sally L.'s health records as "fraudulent." Id. The court reiterated what it had said at sentencing about the issue of Attorney Hicks's license—that the period during which Hicks was not licensed was brief, that he'd taken no actions involving strategy or law and that he'd appeared only once when he shouldn't have, without knowing his license had been suspended. Id. The court found that the petitioner had not demonstrated that

46

the pretrial motions he'd wanted Attorney Hicks to file had any merit, and asserted that the petitioner's arguments with regard to Sally L.'s medical records were "completely irrational and without any logical basis." Id. The court rejected the petitioner's claims of ineffective assistance of counsel. Id. As to the petitioner's claims that the court was biased against him, the court also found those claims to be meritless. Id. The court stated that "[t]he trial transcripts reveal that the court bent over backwards to accommodate [the petitioner] and to ensure that he received a fair and impartial trial despite his refusal to participate in the beginning portion of the trial." Id. at 12. The court concluded that "[a] review of the record demonstrate[d] unequivocally that [the petitioner] was afforded his day in court before a fair and impartial tribunal." Id.

### 3. *Wisconsin Court of Appeals Decision*

On September 17, 2014, the petitioner filed a notice of appeal. Mason, Case No. 2012CF000228. On appeal, he argued that "(1) the circuit court should have granted his motion to sever the charges against him; (2) he was denied the right to self-representation; (3) he received constitutionally ineffective assistance of counsel; and (4) he was denied the right to an impartial judge." Dkt. No. 18-2 at ¶1.

On December 27, 2017, the Wisconsin Court of Appeals affirmed the circuit court's judgment and denials of the petitioner's postconviction motions. Dkt. No. 18-2. The court found that joinder of the charges was proper under state law "because they were part of a common scheme or plan." Id. at ¶6 (citing Wis. Stat. §971.12(1)). Rejecting his argument "that he was prejudiced

47

by the joinder because the charges were all substantiated solely on the word of [Sally L.], who, he argue[d], was not credible," the court determined that the petitioner "ha[d] not adequately developed this argument" and "[did] not explain why [Sally L.'s] purported lack of credibility was more prejudicial to him in a single trial than it would have been in multiple trials." <u>Id.</u> at ¶7.

The Court of Appeals noted that the trial court had denied the petitioner the ability to represent himself "because he repeatedly engaged in deliberately disruptive conduct." <u>Id.</u> at ¶8. The appellate court concluded that the circuit court properly had denied the petitioner's right to self-representation based on his "obstructionist conduct." <u>Id.</u>

The appellate court denied each of the petitioner's ineffective assistance of counsel claims, noting the petitioner had not demonstrated how the suspension of Attorney Hicks's license alone "negatively affected the quality of Hick[s]'s representation" and opining that "[t]he reasons for which Hicks was suspended had nothing to do with Hicks's legal skill pertaining to [the petitioner]." <u>Id.</u> at ¶10. The court stated that the petitioner "argues that he received ineffective assistance of trial counsel because Hicks should *not* have filed a discovery motion to compel production of [Sally L.'s] medical records." <u>Id.</u> at ¶11. The court of appeals agreed with the trial court that this argument was "irrational and without any logical basis." <u>Id.</u> It stated that it could not rule on an issue that the petitioner had not "cogently set forth." <u>Id.</u> As to the petitioner's argument that Hicks was ineffective because he had a conflict of interest, the court found that "[t]he fact that a client has filed an OLR

48

complaint is, without more, legally insufficient to prove a conflict of interest."
Id. at ¶12. It concluded that Attorney Hicks's discipline was not related to his
"substantive representation" of the petitioner, and noted that the petitioner was
"required to show that the alleged conflict of interest affected counsel's
advocacy." Id.

Finally, the appellate court declined to analyze the petitioner's claim that
the trial court was biased, because the petitioner had not "adequately
developed this argument." Id. at ¶13.

The petitioner filed a motion for reconsideration on January 17, 2018.
State v. Jackie Delmas Mason, Appeal No. 2015AP002020 (available at
https://wscca.wicourts.gov). A week later, the Court of Appeals denied the
motion in a two-sentence order. Dkt. No. 18-3. The petitioner filed a second
motion for reconsideration on February 12, 2018. Mason, Appeal No.
2015AP002020. It appears that in the second motion, he asked the panel—
Judges Brennan, Brash and Dugan—to recuse. Dkt. No. 18-4. The court found
that the motion to recuse was moot because the appeal already had been
decided and denied that request. Id. The court denied the motion to reconsider
because the petitioner "present[ed] no cognizable legal argument in support of
his motion." Id.

On April 27, 2018, the petitioner filed a petition for review in the
Wisconsin Supreme Court. Mason, Appeal No. 2015AP002020. On July 10,
2018, the Supreme Court denied review in a single sentence. Dkt. No. 18-5.

49

B.     Federal *Habeas* Petition (Dkt. No. 1)

In his federal *habeas* petition, the petitioner asserts four grounds for relief: (1) whether the Wisconsin Court of Appeals unlawfully denied him relief on the issue of whether the trial court had violated his Sixth Amendment right to represent himself, (2) whether the appellate court unlawfully denied him relief on the issue of his Sixth Amendment right to effective counsel being violated, (3) whether the appellate court unlawfully denied him relief on the claim that his Fourteenth Amendment right to an impartial judge was violated, and (4) whether the Wisconsin Court of Appeals was biased against the petitioner in violation of the Fourteenth Amendment. Dkt. No. 1 at 6-9. On March 26, 2021, this court screened the *habeas* petition, allowed the petitioner to proceed on all four claims and ordered the respondent to answer or otherwise respond. Dkt. No. 11.

Eleven days later, the petitioner filed a "Motion to Motion to Dismiss Claim of Judicial Bias Against Wisconsin Court of Appeals." Dkt. No. 13. The motion stated that the petitioner no longer wished to pursue his judicial bias claim against the Court of Appeals. Id. On May 21, 2021, the respondent answered the petition. Dkt. No. 18. Two weeks later, the petitioner filed a brief in support of the petition. Dkt. No. 22. The petitioner also filed an appendix. Dkt. No. 23. The petitioner also filed a motion to enlarge the record, dkt. no. 24, and a brief in support of that motion, dkt. no. 26. On August 18, 2021, the respondent filed a brief in opposition to the petition, dkt. no. 29, and the petitioner replied a month later, dkt. no. 30.

50

## II. Analysis

### A. *Habeas Corpus* Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant habeas relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §§2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

51

the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S.

86, 102 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

"The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'"

<u>Saxon v. Lashbrook</u>, 873 F.3d 982, 987 (7th Cir. 2017) (quoting <u>Cullen v.

Pinholster</u>, 563 U.S. 170, 181 (2011)).

B.    <u>Self-Representation</u>

1.    *Governing law*

"The Constitution guarantees all defendants the right to counsel during a

criminal trial." <u>United States v. Banks</u>, 828 F.3d 609, 614 (7th Cir. 2016)

(citing <u>Faretta v. California</u>, 422 U.S. 806, 807 (1975)).

> Even the intelligent and educated layman has small and sometimes no skill in the science of the law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defence, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel.

<u>Johnson v. Zerbst</u>, 304 U.S. 458, 463 (1938) (internal quotation mark omitted).

A defendant may, as the above quotation from <u>Johnson</u> suggests, waive

his constitutionally guaranteed right to counsel. But

> "[b]ecause of the importance of the right to counsel in our constitutional scheme, we do not lightly conclude that a defendant has waived his right to counsel." *United States v. Sandals*, 23 F.3d 1121, 1125-26 (7th Cir. 1994). We indulge every reasonable presumption against waiver. *Smith v. Grams*, 565 F.3d 1037, 1044 (7th Cir. 2009).

52

United States v. Johnson, 980 F.3d 570, 576 (7th Cir. 2020). It is the "serious and weighty" responsibility of the trial judge to determine "whether there is an intelligent and competent waiver by the accused." Zerbst, 304 U.S. at 464.

For a defendant to waive his constitutional right to counsel, he first must "'clearly and unequivocally' raise the right to self-representation." United States v. Mancillas, 880 F.3d 297, 301 (7th Cir. 2018) (citing Faretta, 422 U.S. at 835. "Courts have required an unequivocal assertion of the right to self-representation in order to prevent a defendant from using an ambiguous waiver of the right to counsel as a tool to overturn his or her conviction." Id. (citing United States v. Campbell, 659 F.3d 607, 612 (7th Cir. 2011), *vacated on other grounds, sub nom.*, Campbell v. United States, 568 U.S. 802 (2012)).

Second, a defendant seeking to waive his right to counsel must do so in a timely fashion. Id.

> We have noted that "no case holds that an absolute right of self-representation exists after trial begins," *United States v. Kosmel*, 272 F.3d 501, 506 (7th Cir. 2001), and we have upheld the denial of requests to proceed pro se made in the middle of trial. *See [United States v.] Oakey*, 853 F.2d [551,] at 553-54 [[(7th Cir. 1988)]] (finding no error in denial of "ambiguous" request to proceed pro se made prior to fourth day of trial).

> However, we have also recognized that defendants can waive the right to counsel and proceed pro se post-trial and at sentencing. *See United States v. Harrington*, 814 F.3d 896, 900-01 (7th Cir. 2016) (finding a knowing and intelligent waiver of the right to counsel at sentencing).

Id.

When a competent defendant has clearly and unequivocally asserted his

right to represent himself in a timely manner and when the court has

determined that the waiver of the right to counsel was intelligent and

voluntary, "a trial court may not deny it." Banks, 828 F.3d at 614 (citing Imani

v. Pollard, 826 F.3d 939, 943-45 (7th Cir. 2016)). The Supreme Court held in

Faretta that

> [t]he Sixth Amendment does not provide merely that a defense shall
> be made for the accused; it grants to the accused personally the
> right to make his defense. It is the accused, not counsel, who must
> be 'informed of the nature and cause of the accusation,' who must
> be 'confronted with the witnesses against him,' and who must be
> accorded 'compulsory process for obtaining witnesses in his favor.'
> Although not stated in the Amendment in so many words, the right
> to self-representation—to make one's own defense personally—is
> thus necessarily implied by the structure of the Amendment. The
> right to defend is given directly to the accused; for it is he who suffers
> the consequence if the defense fails.

Faretta, 422 U.S. at 819.

While acknowledging that "the right of an accused to conduct his own

defense seems to cut against the grain of this Court's decisions holding that the

Constitution requires that no accused can be convicted and imprisoned unless

he has been accorded the right to counsel," the Faretta Court said "it is one thing

to hold that every defendant, rich or poor, has the right to the assistance of

counsel, and quite another to say that a State may compel a defendant to accept

a lawyer he does not want." Id. at 832-33 (citations omitted).

> It is undeniable that in most criminal prosecutions defendants could
> better defend with counsel's guidance than by their own unskilled
> efforts. But where the defendant will not voluntarily accept
> representation by counsel, the potential advantage of a lawyer's
> training and experience can be realized, if at all, only imperfectly. To
> force a lawyer on a defendant can only lead him to believe that the

54

law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois v. Allen*, 397 U.S. 337, 350-351 . . . [1970] (Brennan, J., concurring).

Id. at 834.

The Seventh Circuit has explained that the fact that a defendant has a Sixth Amendment right to counsel *and* a Sixth Amendment right to represent himself poses challenges for trial courts:

By invoking his *Faretta* right, an accused simultaneously exercises his right to represent himself and waives his right to counsel. *Faretta* is therefore challenging for trial courts to administer. Self-representation is a Sixth Amendment right, and a trial court cannot deny its timely exercise by a competent defendant. *Faretta*, 422 U.S. at 834-36 . . . . On the other hand, if the waiver of the right to counsel is not knowing and voluntary, the conviction will not stand. Before allowing a defendant to proceed without counsel, a trial court therefore has the duty to warn a defendant about what he is getting himself into, but the court cannot just deny the defendant the right he has invoked. The imperative of a knowing and voluntary choice is a requirement for valid waiver of the right to counsel; it is not a condition that must be fulfilled before an accused may be "allowed" to exercise his Sixth Amendment right to represent himself.

Imani, 826 F.3d at 944.

Because a trial court cannot deny a "competent" defendant who timely requests it his right to represent himself, it is incumbent on the trial court to determine whether the defendant is "competent" to waive his right to counsel. That determination begs the question—what does it mean for a defendant to be

55

"competent" to waive his right to the assistance of counsel? In <u>Dusky v. United States</u>, 362 U.S. 402 (1960), the Supreme Court described the standard for determining whether a defendant is competent to stand trial. The court held that

> it is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'

<u>Id.</u> (quoting the Solicitor General).

Fifteen years later, the Court returned to the standard for determining a defendant's competence to stand trial in <u>Drope v. Missouri</u>, 420 U.S. 162 (1975). The <u>Drope</u> Court reiterated that "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." <u>Id.</u> at 171.

Neither <u>Dusky</u> nor <u>Drope</u> addressed whether trial courts should apply the same standard in determining whether a defendant is competent to waive his right to counsel. The Supreme Court articulated that standard years later, in <u>Godinez v. Moran</u>, 509 U.S. 389 (1993). The <u>Godinez</u> Court first explained:

> A criminal defendant may not be tried unless he is competent. *Pate v. Robinson*, 383 U.S. 375, 378 . . . (1966), and he may not waive his right to counsel or plead guilty unless he does so "competently and intelligently," *Johnson v. Zerbst*, 304 U.S. 458, 468 . . . (1938); accord, *Brady v. United States*, 397 U.S. 742, 758 . . . (1970). In *Dusky v. United States*, 362 U.S. 402 . . . (1960) (*per curiam*), we held

56

that the standard for competence to stand trial is whe4ther the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him."

\* \* \* \*

While we have described the standard for competence to stand trial, however, we have never expressly articulated a standard for competence to plead guilty or to waive the right to the assistance of counsel.

Id. at 396.

The Godinez Court held that a "defendant who waives his right to the assistance of counsel" need not be more competent than a person who chooses to stand trial, "since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." Id. at 399. In response to the argument that a defendant who represents himself "must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney," id. (quoting from the respondent's brief, which quoted Silten & Tullis, *Mental Competency in Criminal Proceedings*, 28 Hastings L.J. 1053, 1068 (1977)), the Court stated that "this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself," id. at 399-400 (emphasis in the original). The Court explained:

In *Faretta v. California*, 422 U.S. 806 . . . (1975), we held that a defendant choosing self-representation must do so "competently and intelligently," *id.*, at 835 . . . , but we made it clear that the

57

defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel, *id.*, at 836 . . ., and we emphasized that although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored," *id.*, at 834 . . . . Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than their own unskilled efforts," *ibid.*, a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation.

Id. See also Freeman v. Pierce, 878 F.3d 580, 586 (7th Cir. 2017) ("*Faretta* made clear that a judge's inquiries into a defendant's 'technical legal knowledge' are 'not relevant to an assessment of his knowing exercise of the right to defend himself.'" (quoting Faretta, 422 U.S. at 836)).

But "[a] finding that a defendant is competent to stand trial" is not enough to justify allowing a defendant to waive his right to counsel. Godinez, 509 U.S. at 400.

In addition to determining that a defendant who seeks to . . . waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. *Parke v. Raley*, 506 U.S. 20, 28-29 . . . (1992) (guilty plea); *Faretta*, *supra*, 422 U.S., at 835 . . . (waiver of counsel). In this sense there *is* a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*.

Id. at 400-01. Thus, "when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted." Id. at 402.

Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel. While psychiatrists and scholars may find it useful to classify the various kinds and degrees of competence, and while States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the

58

> Due Process Clause does not impose these additional requirements.
> Cf. *Medina v. California*, 505 U.S. 437, 446-54 . . . (1992).

Id.

A court's determination of whether a defendant's waiver of the right to counsel is intelligent and voluntary "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Zerbst, 304 U.S. at 464. When considering whether a *federal* defendant's waiver of counsel was knowing and intelligent, the Seventh Circuit considers, among other things, whether the trial court conducted a formal hearing on the defendant's decision to represent himself (and the extent of that hearing, if there was one), other evidence in the record bearing on the defendant's understanding of the risks of self-representation, the defendant's background and experience and the context in which the defendant decided to waive his right to counsel. Banks, 828 F.3d at 615 (citing United States v. Volpentesta, 727 F.3d 666, 677 (7th Cir. 2013)). Although a defendant may waive his right to counsel even if he "may ultimately conduct his own defense to his detriment," id. (quoting United States v. Avery, 208 F.3d 597, 601 (7th Cir. 2000)), the court still must make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Id. (citing Faretta, 422 U.S. at 835). The court considers the entire record in determining whether a defendant knowingly and intelligently waived his right to counsel. Faretta, 422 U.S. at 835.

59

Wisconsin courts consider similar factors. In <u>State v. Klessig</u>, 211 Wis.
2d 194, 206 (Wis. 1997), the Wisconsin Supreme Court mandated that a trial
court must conduct a colloquy "in every case where a defendant seeks to
proceed pro se to prove knowing and voluntary waiver of the right to counsel."

> To prove such a valid waiver of counsel, the circuit court must
> conduct a colloquy designed to ensure that the defendant: (1) made
> a deliberate choice to proceed without counsel, (2) was aware of the
> difficulties and disadvantages of self-representation, (3) was aware
> of the seriousness of the charge or charges against him, and (4) was
> aware of the general range of penalties that could have been imposed
> on him.

<u>Id.</u> (citing <u>Pickens v. State</u>, 96 Wis. 2d 549, 563-64 (Wis. 1980) (partially
overruled by <u>Klessig</u>).

The <u>Klessig</u> court also held, however, that "[i]n Wisconsin, there is a
higher standard for determining whether a defendant is competent to represent
oneself than for determining whether a defendant is competent to stand trial."
<u>Klessig</u>, 211 Wis.2d at 212. The court recounted the reasoning from its 1980
decision in <u>Pickens</u>:

> The *Pickens* court first examined the standard for determining
> competency to stand trial which requires that a defendant is able to
> understand the proceedings against him and to assist in his own
> defense. *Pickens*, 96 Wis. 2d at 567, . . . *citing* Wis. Stat. § 971.13
> (1979-1980). This court reasoned that "[c]ertainly more is required
> where the defendant is to actually conduct his own defense and not
> merely assist in it." *Pickens*, 96 Wis.2d at 567 . . . We further
> reasoned that "a defendant who, while mentally competent to be
> tried, is simply incapable of effective communication or, because of
> less than average intellectual powers, is unable to attain the
> minimum understanding necessary to present a defense, is not to
> be allowed 'to go to jail under his own banner.'" *Id.* at 568, . . .
> *quoting United States v. Denno*, 348 F.2d 12, 15 (2d Cir. 1965). Our
> decision in *Pickens* to impose a higher standard for measuring
> competency to represent oneself was based on a logical policy

60

analysis rather than an interpretation of Supreme Court cases. This is the type of higher standard that was recognized in the *Godinez* decision as being within each state's power to adopt.

We thus affirm the holding in *Pickens* as still controlling on the issue of competency.

<u>Id.</u> at 211-12.

In 2008, the Supreme Court revisited the question of a defendant's competence to waive his right to counsel, considering whether "the Constitution prohibits a State from insisting that the defendant proceed to trial with counsel, the State thereby denying the defendant the right to represent himself," where the court found that the defendant was "mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself." <u>Indiana v. Edwards</u>, 554 U.S. 164, 167 (2008).

Ahmad Edwards fired on a security officer and wounded a bystander after trying to steal a pair of shoes from an Indiana store. <u>Id.</u> "His mental condition subsequently became the subject of three competency hearings and two self-representation requests . . . ." <u>Id.</u> First, five months after his arrest, Edwards's court-appointed counsel asked for a psychiatric evaluation; this resulted in the court finding him incompetent to stand trial and committing him to a state hospital for evaluation and treatment. <u>Id.</u> Seven months after Edwards was committed, doctors concluded that he was improved enough to be able to stand trial, but after the passage of several more months, Edwards's counsel asked for another competency evaluation. <u>Id.</u> at 168. After considering additional psychiatric evidence, the court concluded that while Edwards was suffering from mental illness, he was competent to assist his counsel and to

61

stand trial. Id. Seven months later, defense counsel again sought a psychiatric evaluation, and the court held a third competency hearing. Id. At this hearing, defense counsel "presented further psychiatric and neuropsychological evidence showing that Edwards was suffering from serious thinking difficulties and delusions;" a psychiatrist testified that while Edwards could understand the charges against him, he could not cooperate with his attorney because of his "schizophrenic illness," stating that his "delusions and his marked difficulties in thinking ma[d]e it impossible for him to cooperate with his attorney." Id. The court concluded that Edwards was not competent to stand trial and had him recommitted to the state hospital. Id.

Some eight months later, the hospital reported that Edwards had improved to the point that he was competent to stand trial. Id. Almost a year later, just before his trial was about to start, Edwards asked to represent himself; he also asked for a continuance so that he could do so. Id. The judge denied the continuance and Edwards proceeded to trial with counsel. Id. at 168-69. The jury convicted him of two charges but was unable to reach a verdict on two others. Id. at 169. Indiana decided to retry him on the charges on which the jury had hung; just before the second trial, Edwards again asked to represent himself. Id. "Referring to the lengthy record of psychiatric reports, the trial court noted that Edwards still suffered from schizophrenia and concluded that '[w]ith these findings, he's competent to stand trial but I'm not going to find he's competent to defend himself.'" Id. Edwards was represented by counsel at the second trial and the jury convicted him on the remaining

62

counts. Id. Edwards appealed, arguing that the trial court had deprived him of his right to represent himself. Id. The appeals court agreed and ordered a new trial; the Indiana Supreme Court agreed that Faretta and Godinez required the state to allow Edwards to represent himself. Id. "At Indiana's request," the United States Supreme Court "agreed to consider whether the Constitution required the trial court to allow Edwards to represent himself at trial." Id.

The Edwards Court found that Faretta did not answer the question "because it did not consider the problem of mental competency . . . and because *Faretta* itself and later cases have made clear that the right of self-representation is not absolute;" the Edwards Court framed the question as a "mental-illness-related limitation on the scope of the self-representation right." Id. at 171 (citations omitted). The Court concluded that Godinez did not answer the question, because the defendant in Godinez sought only to change his plea and did not seek "to conduct trial proceedings;" the Edwards defendant's "ability to conduct a defense at trial was expressly not at issue." Id. at 173.

The Edwards Court then addressed the issue it felt had been left unaddressed in Faretta and Godinez:

> We assume that a criminal defendant has sufficient mental competence to stand trial (*i.e.*, the defendant meets *Dusky*'s standard) and that the defendant insists on representing himself during that trial. We ask whether the Constitution permits a State to limit that defendant's self-representation right by insisting upon representation by counsel at trial—on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented.
>
> Several considerations taken together lead us to conclude the answer is yes.

63

Id. at 174.

The Court pointed first to the fact that its mental competency cases assumed representation by counsel and the importance of such representation; it found that those cases "suggest (though do not hold) that an instance in which a defendant who would choose to forgo counsel at trial presents a very different set of circumstances, which in our view, calls for a different standard." Id. at 174-75. Second, the Court observed that mental illness is not a "unitary concept and may vary in degree and over time. Id. at 175. It observed that someone might be able to work with counsel at trial (thus satisfying the Dusky standard) but "be unable to carry out the basic tasks needed to present his own defense without the aid of counsel." Id. at 175-76. The Court quoted from an *amicus* brief filed by the American Psychiatric Association, stating that

> "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the role of represented defendant."

Id. at 176.

Third, the Court found that a defendant who lacked the mental capacity to conduct his defense without the assistance of counsel would not achieve the individual dignity underlying the right to self-representation; "the spectacle that could well result from his self-representation is at least as likely to prove humiliating as enobling." Id. The Court found that a defendant's lack of capacity also could threaten his right to a fair trial. Id.at 176-77.

The Edwards Court concluded that

64

the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

Id. at 177-78.

The Edwards Court declined, however, to "adopt, as a measure of a defendant's ability to conduct a trial, a more specific standard that would 'deny a defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury.'" Id. at 178 (quoting from the petitioner's brief). The Court expressed uncertainty as to "how that particular standard would work in practice," and that uncertainty convinced the Court not to adopt it as a federal constitutional standard. Id. The Court also declined Indiana's request that it overrule Faretta. Id. While acknowledging that some judges felt that Faretta led to unfair trials, the Edwards Court stated that "instances in which the trial's fairness is in doubt may well be concentrated in the 20 percent or so of self-representation cases where the mental competence of the defendants is also at issue." Id. The Court stated, "If so, today's opinion, assuring trial judges the authority to deal appropriately with cases in the latter category, may well alleviate those fair trial concerns." Id. at 178-79.

In Imani, the Seventh Circuit characterized Edwards as a member of a "narrow class of cases in which a defendant may not be competent to represent himself at trial . . . ." Imani, 826 F.3d at 946. In Jordan v. Hepp, 831 F.3d 837, 843-44 (7th Cir. 2016), the court also noted that the Supreme Court "has not

65

banned all inquiry" into a defendant's technical ability to represent himself; the

Jordan court indicated that the Supreme Court has "delineated some ways in

which states may limit the right to self-representation." Id.

> For example, in *Faretta* itself the Court recognized that a trial court
> may forbid a defendant from representing herself if she is disruptive
> in the courtroom or engages in misconduct. 422 U.S. at 835 n.46 .
> . . . Later it held that a state court may forbid a defendant from
> representing herself on direct appeal. *Martinez v. Ct. of Appeal of
> Cal., Fourth Appellate Dist.*, 528 U.S. 152, 153 . . . (2000).

Id. at 844. And the Jordan court reiterated that under Edwards, "[i]t is

permissible . . . to deny self-representation to a defendant who 'suffer[s] from

mental illness or mental impairment.'" Id. (quoting Imani, 826 F.3d at 946).

But the Jordan court noted that in Imani, it had recognized that "there

would be 'gray-area' defendants," and it asserted that states "may not resolve

doubts against self-representation and remain faithful to *Faretta*." Id.

2.    *Discussion*

When a "state court has made a decision on the merits," this federal

court may grant *habeas* relief "only if that decision was 'contrary to, or involved

an unreasonable application of clearly established Federal law' as determined

by the Supreme Court," Jordan, 831 F.3d at 843 (citing 28 U.S.C. §2254(d)(1),

or if the state court's adjudication "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in

the State court proceeding," 28 U.S.C. §2254(d)(2). This court applies that

standard "to the decision of the last state court to rule on the merits of the

petitioner's claim." Jordan, 831 F.3d at 843 (citing Ylst v. Nunnemaker, 501

U.S. 797 (1991)). <u>See also</u>, <u>Wilson v. Sellers</u>, ___ U.S. ___, 138 S. Ct. 1188, 1192 (2018) (holding that when the last state-court decision to rule on the merits is not accompanied by reasoning supporting the decision, the federal court should "look through" to "the last related state-court decision that does provide a relevant rationale.").

The last decision on the merits of the petitioner's claim was the decision by the Wisconsin Court of Appeals on December 27, 2017. Dkt. No. 18-2. The Court of Appeals addressed the petitioner's argument that the circuit court denied his right to self-representation in one paragraph:

> [The petitioner] next argues that he was denied the right to self-representation. A mentally competent defendant has a constitutional right to represent himself. *See **Faretta v. California***, 422 U.S. 806, 834-35 (1975). However, where a defendant "engages in 'serious and obstructionist misconduct,' a judge may deny the exercise of the right of self-representation." ***Imani v. Pollard***, 826 F.3d 939, 947 (7th Cir. 2016) (citation omitted). Here, the circuit court denied [the petitioner] permission to represent himself because he repeatedly engaged in deliberately disruptive conduct. As the circuit court observed at one point: "My concern with your competency has always been basically your ability to communicate in the courtroom. You have always been extremely difficult. You have been disruptive. You have been disrespectful." Based on [the petitioner's] obstructionist conduct, the circuit court properly denied him permission to represent himself during the trial.

Dkt. No. 18-2 at ¶8.

Although the court acknowledges that the federal *habeas* standard is highly deferential to the state court, it concludes that the above decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. The statements of the trial court quoted by the Court of Appeals—"My concern with your competency has always

Case 2:18-cv-01351-PP   Filed 03/14/22   Page 67 of 104   Document 31

been basically your ability to communicate in the courtroom. You have always been extremely difficult. You have been disruptive. You have been disrespectful."—occurred on the morning of November 26, 2012, the first day of the petitioner's trial. Dkt. No. 18-10 at 6. But the court had denied the petitioner's request to represent himself on August 31, 2012, almost three months *before* the trial, and when ite denied the request, it was not on the ground that the petitioner had been disruptive.

It appears that the petitioner first made the request to represent himself in a letter the court received on May 15, 2012—before the case was reassigned from Judge Dallet to Judge Brostrom. That letter is not part of the record, so the court does not know how "clear and unequivocal" the request was. But the petitioner made the request well in advance of trial; the May 7, 2012 trial date had been adjourned because Attorney Wilson had moved to withdraw and no new trial date had been set.

On August 10, 2012, at the first hearing before Judge Brostrom (and the first hearing attended by both the petitioner and Attorney Hicks), the court addressed the letter and held a colloquy with the petitioner. It appears from the transcript that by the end of that hearing, the petitioner had decided to proceed with Attorney Hicks. This record is not sufficient to allow the court to conclude that by the end of the August 10, 2012 hearing, the petitioner had made a clear and unequivocal request to waive his right to counsel and to represent himself.

On August 17, 2012, however, the court received another letter from the petitioner. At the August 31, 2012 pretrial conference, the court told the

petitioner that it had received that letter and that it appeared the petitioner had dated it August 13, 2012. Dkt. No. 18-19 at 4. Almost immediately, the petitioner stated that he wanted Attorney Hicks removed and that he wanted to represent himself. Id. The court advised the petitioner that it had recently had a trial with Attorney Hicks and that he had obtained a not guilty verdict; it advised the petitioner to "think long and hard" about whether he wanted to relieve Attorney Hicks. Id. at 4-5. The petitioner responded, "I would like to represent myself," then explained that if he did get a lawyer, he would hire his own. Id. at 5. When the court responded that there was no time for the petitioner to hire a lawyer, the petitioner said that there were witnesses who had not been interviewed and that it was "not going to be possible to make the trial date." Id. After conferring with Attorney Hicks about the progress of his investigator, the court stated:

> [Petitioner], I don't find you competent to represent yourself, and I will tell you why. The comments that you are making suggests to me a lack of rationality, and a lack of ability to really adequately evaluate where you are in this trial process and what your best interests are. Your lawyer is doing all of the things that need to be done. You are not going to be able to do them while you are in custody. Your lawyer has a private investigator out speaking to or trying to speak to the witnesses that you think are relevant. You are not going to be able to make that happen while you are in custody. Your lawyer is trained in the law, and the State has submitted a motion to admit other acts evidence. You are not competent to respond to that—

Id. at 6.

When the petitioner tried to interject, the court told him not to interrupt her, and continued:

> You are not competent to respond to that motion. And for you to try to protest to me here today that you think you can do a better job on this than Mr. Hicks, and that you can do it all by September 10th, tells me that you are not competent to represent yourself. I deny your motion and make that finding.

Id. at 7.

The petitioner then told the court that he would not work with Attorney Hicks and asserted his innocence; the court advised him that refusing to work with Attorney Hicks would amount to "actively" forfeiting his right to "have [his] defense put on according to [his] best interest." Id. The court told the petitioner that if he did not cooperate with Attorney Hicks, it would make Attorney Hicks "do it without" the petitioner's cooperation. Id. at 8. The petitioner protested that this was "not right" and again stated, "I would like to represent myself." Id. the court responded:

> The fact that you think I am wrong, confirms the fact that you are not competent to represent yourself. Your comments are irrational. They show a complete inability to represent yourself. I find as a matter of law that you are not competent to do so.

Id. After further back and forth (in which the petitioner asserted that the court had found him competent at the August 10 hearing, the court disagreed and the petitioner complained about Attorney Hicks), the court turned to the lawyers to discuss scheduling. Id. at 8-9.

By the end of the August 31, 2012 pretrial conference, the petitioner had asked to represent himself four times: once in the letter the court referenced and three times during the hearing. Those requests—at least, the oral ones— were clear and unequivocal. The fact that the petitioner also expressed dissatisfaction with Attorney Hicks's representation and asked to have him

70

removed "[did] not make a self-representation request equivocal . . . ." Freeman

v. Pierce, 878 F.3d at 588. "The right of self-representation would be virtually

impossible to invoke if dissatisfaction with counsel meant equivocation since

most requests to proceed pro se are premised on precisely those grounds." Id.

at 588-89 (citing Batchelor v. Cain, 682 F.3d 400, 408 (5th Cir. 2012)). The

requests also were timely. The petitioner articulated the first, written request in

his August 13, 2012 letter, four weeks before the September 10, 2012 trial

date. He reiterated those requests orally on August 31, 2012, ten days before

the scheduled trial date.

The Wisconsin Court of Appeals did not affirm the trial court's decision

on the grounds that the petitioner's requests were not clear and unequivocal,

or on the ground that they were not timely made. The Court of Appeals

affirmed the decision on the ground that the petitioner's behavior was allegedly

"obstructionist." But in the August 31, 2012 ruling denying the petitioner's

requests to represent himself, the trial court did not use the words

"communicate," "difficult," "disruptive" or "disrespectful." The court's

statements indicate that it concluded that it was not rational for the petitioner

to seek to represent himself when he had an attorney whom the court felt was

adequately representing him. The court's comments indicate that it did not

think the petitioner had the ability to adequately address the pending "Other

Acts" motion and that it did not think the petitioner could be prepared for the

September 10 trial date if he represented himself. The court's comments

71

indicate that it perceived the petitioner's disagreement with the court and his unwillingness to accept its ruling as an indication that he was not rational.

The appellate court's conclusion that the trial court denied the petitioner's request because the petitioner "repeatedly engaged in deliberately disruptive conduct" was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Over the three months between the trial court's August 31, 2012 ruling and the November 2012 trial, as well as during the trial, there were further interactions between the petitioner and the court. The petitioner sent letters and filed motions. He repeatedly stated that he wanted to represent himself, or that he did not want Attorney Hicks to represent him, or both.[7] A written transcript does not enable the reader to discern tone, inflection or emotional nuance. The words exchanged between the petitioner and the court, as well as descriptions of some of the petitioner's interactions with Attorney Hicks, leave this court with the impression that by November 26, 2012, the trial court may have had reason to perceive the petitioner as difficult, disruptive and disrespectful. The words also leave this court with the impression that by the time the trial started, the petitioner (rightly or wrongly) had become

---

[7] The petitioner was not required to continually reassert his right to self-representation to preserve that right; in <u>Freeman</u>, the Seventh Circuit held that "Freeman was under no obligation to reassert his motion or continually object to the court's denial of his motion after the court had clearly denied his request." <u>Freeman</u>, 878 F.3d at 590 (citing <u>Faretta</u>, 422 U.S. at 810-11; <u>Batchelor</u>, 682 F.3d at 412; <u>Buhl v. Cooksey</u>, 233 F.3d 783, 803 (3d Cir. 2000); <u>Wilson v. Walker</u>, 402 F.3d 33, 37 (2d Cir. 2000); <u>United States v. Arlt</u>, 41 F.3d 516, 523 (9th Cir. 1994)).

Case 2:18-cv-01351-PP   Filed 03/14/22   Page 72 of 104   Document 31

increasingly frustrated with Attorney Hicks and with the trial court's refusal to allow him to take over his own representation. Assuming without deciding that the petitioner *did* engage in difficult, disruptive and disrespectful behavior, that behavior occurred *after* the court denied his request to represent himself at only the second hearing he'd had before it.

In Washington v. Boughton, 884 F.3d 692 (7th Cir. 2018), the Seventh Circuit concluded that the state courts' denial of the *habeas* petitioner's request to represent himself violated the Constitution. "During pre-trial proceedings, Washington expressed dissatisfaction with his counsel's performance and told the court that he wanted to represent himself." Id. at 695. At a later hearing, Washington told the court he wanted "to go *pro se* in this case and defend [himself]." Id. "Although he withdrew his request the same day after conferring with his counsel, he revived it on the morning of . . . the day his trial was scheduled to begin." Id. After a colloquy, the trial court denied the request based on its belief that the petitioner was not capable of understanding and addressing the DNA evidence. Id. at 696. The case went to trial "with Washington represented by a lawyer he didn't want" and Washington "was convicted and sentenced to 100 years in prison." Id.

On direct appeal, Washington argued the trial court improperly denied his request to represent himself. Id. The Wisconsin Court of Appeals affirmed. Id. "It agreed that Washington was not competent to proceed *pro se*, adding its own reasons to support the trial court's decision." Id. The appellate court agreed that Washington was incapable of defending himself against DNA

73

evidence, "reasoning that Washington's 'irrational and disruptive' pre-trial conduct reflected his inability to understand and focus on a critical part of the case." Id. at 696-697. The Court of Appeals "further noted that Washington's desire to represent himself was grounded in a belief that his attorney was complicit with the prosecutor and the trial court in 'fabricating' his arrest warrants, and that his 'obsession with a conspiracy theory led to frequent disruptions in the courtroom.'" Id. at 697.

The Seventh Circuit noted that while the trial court had given three reasons for denying Washington his right to represent himself, the appellate court had relied on only one, "reasoning that Washington's 'irrational and disruptive' behavior leading up to trial evidenced an inability 'to understand and decipher' the state's DNA evidence." Id. at 701. "The appellate court further concluded that Washington's 'inability to recognize and follow courtroom decorum or to identify and argue legitimate legal issues in his own defense' supported the lower court's determination that Washington 'would not be able to properly focus on and understand the complicated DNA evidence that was critical to the State's case.'" Id. at 701-02.

The Seventh Circuit relied on Faretta, Imani, Tatum v. Foster, 847 F.3d 459, 467 (7th Cir. 2017) and Jordan in concluding that the state court of appeals unreasonably applied federal law in upholding the denial of Washington's right to represent himself. Id. at 702-05. In reaching that conclusion, the court stated:

> What troubles us about the Wisconsin appellate court's conclusion that Washington's conduct justified the denial of his right to

74

represent himself is another matter: The bulk of the conduct the court points to as "irrational and disruptive" (and nearly all of the conduct the State details in its brief) occurred *after* the trial court rejected Washington's request to proceed *pro se* and concerned his insistence that the court, the State, and his attorney were conspiring against him. As the Court observed in *Faretta*, "[t]o force a lawyer on a defendant can only lead him to believe that the law contrives against him." 422 U.S. at 834 . . . . Washington's conspiracy theory is almost certainly without substance—and his singular focus on it misguided—but it is not irrational. *See id.* The trial court would have been on solid constitutional ground had it allowed Washington to waive his right to counsel, then terminated his self-representation if it became clear that Washington was mentally unfit to conduct trial proceedings or that he sought to "use the courtroom for deliberate disruption" of his trial. *Id.* at 834 n.46 . . . . What it could not do, consistently with *Faretta, Godinez,* and *Edwards,* was find him incompetent to waive his right to counsel and proceed to trial *pro se* based on its belief that he lacked the specialized knowledge required to confront the State's DNA evidence. Nor could the Wisconsin Court of Appeals rehabilitate the trial court's constitutionally infirm decision by pointing to conduct that occurred after the decision was made.

Id. at 705.

Change the petitioners' names and a couple of facts, and that paragraph would describe what happened in the instant case. The respondent argues that "the record is replete" with evidence of the petitioner's obstructionist behavior. Dkt. No. 29 at 18. First, he points to the fact that Attorney Hicks was appointed to represent the petitioner because the petitioner had suffered a breakdown in communication with his prior attorney, Attorney Wilson. Id. The respondent quoted from the state's opposition brief to the petitioner's appeal, which purports to quote Judge Dallet's comments from the May 2012 hearing at which she allowed Attorney Wilson to withdraw: "I don't like the fact that the reason for the lack of communication is that [the petitioner] was refusing to

cooperate with his attorney who was trying to prepare for trial. To me that looks like manipulation of the system, and it's really not—it's not fair . . . [.]" Id. at 18-19 (citing Dkt. No. 18-8 at 12-13). This transcript is not part of the record, but assuming that Judge Dallet made that statement, there is no evidence that Judge *Brostrom* knew of it on August 31, 2012 when she denied the petitioner's requests to represent himself.

The respondent next points to the petitioner's statement at the August 31, 2012 hearing that he refused to work with Attorney Hicks. Id. at 19. The petitioner made that statement *after* the trial court twice had told him that it was denying his requests to represent himself. Next, the respondent asserts that the petitioner "repeatedly" interrupted the court, citing to three instances. Id. One of those instances occurred at the August 10, 2012 hearing; after the court had admonished the petitioner, it did not happen again during that hearing. Dkt. No. 18-18 at 5. The second instance occurred at the August 31, 2012 hearing as the court was telling the petitioner that it had received his letter but explaining her view that Attorney Hicks was on top of the case. Dkt. No. 18-19 at 4. The last instance occurred after the court began giving the petitioner the reasons it had concluded that he was not competent to represent himself. Id. at 6-7.

The other examples of "obstructionist" behavior the respondent describes—the petitioner's allegations that Attorneys Wilson and Hicks had conspired with the state against him, the court's comments on the first day of trial—occurred *after* August 31, 2012, when the court had denied the

76

petitioner's requests to represent himself. Thus, the only examples of arguably "obstructionist" behavior witnessed by the court that occurred *before* its ruling denying the petitioner's requests to represent himself were one incident of the petitioner briefly interrupting the court at the August 10 hearing and two occurrences of his interrupting the court as it was telling him that he was incompetent to represent himself. The court did not reference those incidents in its August 31, 2012 denial of the petitioner's requests to represent himself. Neither the Wisconsin Court of Appeals nor the respondent may justify the trial court's decision based on conduct that occurred after it made that decision.

The court also concludes that the Wisconsin Court of Appeals' decision involved an unreasonable application of clearly established federal law. The court cited the Seventh Circuit's decision in Imani in stating that a court may deny a defendant the right to self-representation if that defendant engages in serious obstructionist conduct. It is true that in Imani, the Seventh Circuit used the phrase "serious and obstructionist misconduct." Imani, 826 F.3d at 947. But the Imani court was discussing the Wisconsin Supreme Court's conclusion that the trial court in that case "did not err by taking 'into consideration the trial schedule when determining whether Imani was competent to proceed pro se . . . .'" Id. The Seventh Circuit stated:

> Finally, the Wisconsin Supreme Court's conclusion that the trial court did not err by taking "into consideration the trial schedule when determining whether Imani was competent to proceed pro se" was also contrary to *Faretta*. See *Imani*, 786 N.W.2d at 54. Where a defendant invokes his right so late as to delay a trial or engages in "serious and obstructionist misconduct," a judge may deny the exercise of the right of self-representation. *Faretta*, 422 U.S. at 834-35 and n.46 . . . . But a late request would have no bearing on

77

competence. Under *Faretta*, legal skill and experience are not required to be competent to represent oneself. *Id.* at 835 . . . . And in any case, Imani made his request four weeks before trial and said he would not need any extra time to prepare. *Faretta* held it was constitutional error to deny request made "weeks before trial." *Id.* The judge would have been entitled to hold Imani to that assurance if he had later asked for a delay, but he could not deny Imani his Sixth Amendment right to represent himself on this basis.

Id.

As the court has noted, the petitioner sent a letter in May 2012—just after the May 7 trial was adjourned and before the case had been assigned to Judge Brostrom—indicating that he wanted to represent himself. He backed off that request at the August 10, 2012 hearing, but renewed the request in a letter dated August 13, 2012, almost a month before the September 10, 2012 trial date. The trial court did not reference any attempted delay as a basis for denying the petitioner's requests to represent himself.

In a case involving a defendant who represented himself, the Supreme Court has held that,

[a]lthough mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 446 . . . (1938), we explicitly hold . . . that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

Illinois v. Allen, 397 U.S. 337, 343 (1970). The Court concluded that "Allen's behavior was clearly of such an extreme and aggravated nature as to justify either his removal from the courtroom or his physical restraint." Id. at 345-46.

78

The <u>Faretta</u> Court referenced <u>Allen</u> in a footnote to its conclusion that a defendant's right to self-representation must be honored even if the defendant's exercise of that right might be to his detriment:

> We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See *Illinois v. Allen*, 397 U.S. 337 . . . . Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States v. Dougherty*, . . . 473 F.2d 1113, 1124-1126.
>
> The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

<u>Faretta</u>, 422 U.S. at 834 n.46.

Thus, the Wisconsin Court of Appeals correctly stated the law when it stated that a court may deny a defendant's right to self-representation if he engages in serious and obstructionist misconduct. But its application of that law was unreasonable. The court already has found that the trial court did not state that it was denying the petitioner's requests to represent himself based on serious or obstructionist misconduct; the court gave that explanation months after denying the requests. Even if the trial court had stated in its August 31, 2012 denial of the petitioner's requests to represent himself that it was doing

79

so based on obstructionist conduct, the Court of Appeals did not discuss the applicable case law and did not analyze whether the petitioner had, in fact, engaged in such conduct. It seems unlikely that after reading the Allen Court's description of the defendant's extreme conduct in that case, the Wisconsin Court of Appeals would have concluded that three occurrences of the petitioner interrupting the judge, two of which occurred during a hearing in which she was denying the petitioner the right he sought to exercise, constituted the kind of intentionally disorderly, disruptive and disrespectful behavior described in Allen. As the Seventh Circuit suggested in Washington, the trial court could have allowed the petitioner to waive his right to counsel and represent himself, then terminated the self-representation if he had demonstrated such behavior.

The respondent also argues that "the circuit court properly denied [the petitioner's] request to represent himself for a second reason the Court of Appeals did not address: [the petitioner] was not competent to represent himself because he demonstrated an inability to communicate in the courtroom." Dkt. No. 29 at 20. The respondent cites Klessig in support of this argument, as well as Edwards. Id. The respondent says:

> The circuit court identified a specific problem in this case that rendered [the petitioner] incompetent to represent himself at trial: his "psychological inability to communicate in the courtroom." (Dkt. [No.] 18-10 [at 6]). This was not merely a determination that [the petitioner] lacked sufficient legal knowledge to effectively represent himself. *See Faretta*, 422 U.S. at 836 (defendant's right to self-representation not dependent on technical legal knowledge). Rather, the court identified a specific issues—[the petitioner's] inability to communicate in a courtroom—that rendered [the petitioner] incompetent to represent himself. Because the trial judge is "best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant,"

80

*Edwards*, 554 U.S. at 177, this basis for denying [the petitioner] self-representation was also reasonable.

Id. at 21.

This argument suffers from the same defect as the "obstructionist behavior" argument. It was on November 26, 2012—the first day of trial and almost three months *after* denying his requests to represent himself—that the trial court told the petitioner that the issue it had with his self-representation was his "ability to communicate in the courtroom and a psychological inability to communicate in the courtroom." Dkt. No. 18-10 at 6. Whatever the court meant by a "psychological inability to communicate in the courtroom," it was not the reason the court gave for denying the petitioner's requests to represent himself when it denied those requests on August 31, 2012.

The reasons that the trial court gave at the August 31, 2012 hearing for denying the petitioner's requests do not appear to pass constitutional muster. The court first told the petitioner,

> The comments that you are making suggests to me a lack of rationality, and a lack of ability to really adequately evaluate where you are in this trial process and what your best interests are. Your lawyer is doing all of the things that need to be done. You are not going to be able to do them while you are in custody. Your lawyer has a private investigator out speaking to or trying to speak to the witnesses that you think are relevant. You are not going to be able to make that happen while you are in custody. Your lawyer is trained in the law, and the State has submitted a motion to admit other acts evidence. You are not competent to respond to that—

Dkt. No. 18-19 at 6.

After the petitioner attempted to interject, the court said:

> Do not interrupt the Court. You are not competent to respond to that motion. And for you to try to protest to me here today that you

81

think you can do a better job on this than Mr. Hicks, and that you can do it all by September 10th, tells me you are not competent to represent yourself. I deny your motion and make that finding.

Id. at 7. After further discussion about the petitioner's assertion that he would not work with Attorney Hicks (and after the petitioner again said that he wanted to represent himself), the court stated:

The fact that you think I am wrong, confirms the fact that you are not competent to represent yourself. Your comments are irrational. They show a complete inability to represent yourself. I find as a matter of law that you are not competent to do so.

Id. at 8.

It appears that the trial court was convinced that it was not in the petitioner's best interests to represent himself. But as the Seventh Circuit stated in Imani, "Only in rare cases will a trial judge view a defendant's choice to represent himself as anything other than foolish or rash." Imani, 826 F.3d at 945. "[I]n the end a competent defendant has a constitutional right to represent himself even if the judge thinks the defendant has no good reason to do so," and "[n]othing in *Faretta* or its progeny allows the judge to require the defendant to prove he is making the choice for a reason the judge finds satisfactory." Id.

The trial court told the petitioner that he did not have the legal knowledge, skill or resources that a lawyer would have. The Imani court emphasized that Faretta prohibits a court from denying self-representation on that basis:

Imani obviously did not have [prior criminal trial] experience, but the [state] court was applying the wrong legal standard, flatly contrary to *Faretta*, where the Court explained: "We need make no

82

assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the [state law] provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 836 . . . .

Id. at 946.

The respondent cited Edwards in support of his assertion that the court's application of the law on this basis was reasonable, but the Seventh Circuit has found that Edwards did not "introduce[] the possibility of taking into account the defendant's legal knowledge." Tatum, 847 F.3d at 465. See also Washington, 884 F.3d at 703 (quoting Tatum) ("Edwards did not, however, "introduce[] the possibility of taking into account the defendant's legal knowledge," as the Court's emphasis remained on the defendant's mental competence."). The Tatum court emphasized that the Edwards decision focused on mental competence, not particular legal skill. Tatum, 847 F.3d at 466.

The trial court used the words "rational" and "competent" when describing its concerns about whether the petitioner could represent himself as well as a lawyer could. Perhaps the court used those words because of the Wisconsin Supreme Court's holding that "'a defendant who, while mentally competent to be tried, is simply incapable of effective communication or, because of less than average intellectual powers, is unable to attain the minimum understanding necessary to present a defense, is not to be allowed "to go to jail under his own banner."'" Klessig, 211 Wis.2d at 211-12 (quoting Pickens, 96 Wis. 2d at 568 (quoting Denno, 348 F.2d at 15)). The Klessig court

83

described this as a higher standard than the standard for determining whether a defendant is competent to stand trial. Id. at 212.

The Seventh Circuit has several times expressed concern about the application of Wisconsin's higher Klessig standard in self-representation cases. In Imani, the court found that in applying the Klessig standard to deny the defendant's request to represent himself, "the state court imposed a competence standard much more demanding than *Faretta* and its progeny allow, as if the issue were whether Imani was an experience criminal defense lawyer." Imani, 826 F.3d at 944. In Jordan, the Seventh Circuit opined that the state courts had come "close to making an unreasonable application of the *Faretta* line of cases" when they concluded that the defendant's "limited literacy and education" prevented him from "effectively represent[ing] [himself] and present[ing] a meaningful defense . . . ." Jordan, 831 F.3d at 842-43. The Jordan court held that the state courts' decisions were not unreasonable, however, due to the fact "that the Supreme Court itself recognized that certain forms of mental disability deserved special consideration." Id. at 845. The court concluded that because Jordan was illiterate, he was "unlikely to be able to avoid confronting the written evidence in his case—evidence that was functionally unavailable to him because of his near-illiteracy." Id.

In Tatum, the Seventh Circuit noted that instead of focusing on the *Faretta* line of cases, the state courts had relied on Klessig in denying Tatum's request to represent himself. Tatum, 847 F.3d at 466. The Seventh Circuit found that

84

the state court, in applying *Klessig*, strayed from the "mental functioning" sense of competence over to education achievement and familiarity with the criminal justice system. As the Wisconsin Supreme Court put it, "[i]n making a determination on a defendant's competency to represent himself, the circuit court should consider factors such as the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his ability to community a possible defense to the jury." [*Klessig*, 564 N.W.2d] at 724 (internal quotation marks omitted). It is a short step from those factors to the state trial judge's concern about the level of education Tatum had achieved (tenth grade) and his apparent lack of awareness of the difficulties of self-representation.

Id. at 467. The Seventh Circuit observed that nothing in the state trial court's colloquy with Tatum suggested that Tatum's mental functioning was deficient. Id. at 467. It found that the way the state courts had implemented the Klessig test was "inconsistent with *Faretta's* prohibition against resting the determination about the knowing and intelligent nature of the defendant's choice on his 'technical legal knowledge.'" Id. at 468.

Finally, in Washington, the state asked the Seventh Circuit to consider its decisions in Imani and Tatum as "wrongly decided." Washington, 884 F.3d at 704. The Seventh Circuit declined, stating that it "remain[ed] convinced that those decisions—which have withstood a motion for rehearing en banc (denied in *Imani*) and a petition for a writ of certiorari (denied in *Tatum, Foster v. Tatum*, ___ U.S. ___, 138 S. Ct. 355 . . . (Oct. 16, 2017))—arrive at the outcome mandated by the clear rules established in *Faretta* and its progeny." Id.

During the August 31, 2012 hearing, the trial court did not mention Klessig, but the language the court used is reminiscent of language from that decision. This court concludes that the trial court's determination that the

petitioner was "irrational" and was not "competent" to represent himself—whether based on <u>Klessig</u> or not—was inconsistent with the evidence before it and with the <u>Faretta</u> line of cases. At the August 10, 2012 final pretrial, the court had conducted a colloquy with the petitioner. Dkt. No. 18-18 at 7-11. That colloquy revealed that the petitioner was fifty-two years old—a mature adult. <u>Id.</u> at 7. It revealed that he had represented himself in court one time, in intake court four or five years earlier. <u>Id.</u> The petitioner told the court that no one had threatened him or promised him anything to get him to waive his right to a lawyer, showing that the petitioner's decision was voluntary. <u>Id.</u> at 8. The petitioner told the court that he was aware that he'd been charged in six counts and that he faced a maximum sentence of forty-four years in custody. <u>Id.</u> He affirmed that he was aware that the state would be represented by counsel experienced in prosecuting sexual assault cases and that the prosecutor would not be representing the petitioner's interests. <u>Id.</u> He affirmed that he understood that the court could not represent his interests. <u>Id.</u> at 9. The petitioner affirmed that the rules would apply to him, that he did not know the rules of evidence or how to form questions, that he did not know how to obtain discovery, that he did not know how to argue in front of a jury and that he was not trained in the law. <u>Id.</u> The petitioner told the court that he never had been diagnosed with any mental health issues or emotional problems. <u>Id.</u> at 10.

The transcript of the August 10, 2012 pretrial gives no indication that the petitioner was not mentally competent to waive his right to counsel or to assert his Sixth Amendment right to represent himself. It gives no indication

that the petitioner had a history of serious mental illness (or any history of mental illness of any sort). It gives no indication that the petitioner was illiterate; in fact, he had written a letter to the court prior to the hearing. By the August 31, 2012 hearing, the petitioner had written another letter to the court, thus demonstrating that he was not illiterate. The trial court denied the petitioner's request to represent himself after only a brief discussion and with no further colloquy with the petitioner beyond that conducted at the August 10, 2012 hearing. Nothing the petitioner said at either August 2012 hearing indicated that he was mentally ill or incapable of understanding what he was doing. At neither hearing did the court inquire about the petitioner's education level; much later, on the first day of trial, the court did ask that question, and the petitioner advised her that he'd gone to college for electrical engineering and that his reading level in 2000 was "off the charts."

The Wisconsin Court of Appeals' decision that the trial court's denial of the petitioner's right to represent himself was justified by his "obstructionist" behavior was based on an unreasonable determination of the facts in light of the evidence present at the August 31, 2012 hearing and involved an unreasonable application of clearly established federal law. The trial court's August 31, 2012 denial of the petitioner's requests to represent himself on the grounds that he was "irrational" and was not "competent" to represent himself was based on an unreasonable determination of the facts in light of the evidence and involved an unreasonable application of clearly established federal law.

87

The court will grant the petition and direct the respondent to release the petitioner within one hundred twenty days unless the State of Wisconsin elects to retry him. See Owens v. Duncan, 781 F.3d 360, 366 (7th Cir. 2015).

C.     Ineffective Assistance of Counsel

        1.     *Governing Law*

"Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [the petitioner] must demonstrate that (1) his counsel's performance was deficient; and (2) that deficiency resulted in prejudice." United States v. Berg, 714 F.3d 490, 496-97 (7th Cir. 2013) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984). "The performance prong of *Strickland* requires a [petitioner] to show 'that counsel's representation fell below an objective standard of reasonableness.'" Lafler v. Cooper, 566 U.S. 156, 163 (2012) (quoting Hill v. Lockhart, 474 U.S. 52, 57 (1985)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Lafler, 566 U.S. at 163 (quoting Strickland, 466 U.S. at 694).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254 is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential", and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable

88

applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

Harrington, 562 U.S. at 105 (internal citations and quotations omitted).

### 2. *The Parties' Arguments*

The federal *habeas* petition asserts that Attorney Hicks was ineffective because he filed a motion to compel discovery that, according to the petitioner, contained false claims; because when the petitioner confronted Hicks with the false claims and demanded that he withdraw the motion, Hicks refused; that because Hicks refused, there was a conflict between Hicks and the petitioner; and that the petitioner was prejudiced because at trial, the prosecution moved into evidence the medical records obtained as a result of the motion to compel. Dkt. No. 22 at 14-21.

The respondent argues that the petitioner procedurally defaulted on the ineffective assistance of counsel claims because the Wisconsin Court of Appeals rejected them on an independent and adequate state ground. Dkt. No. 29 at 21. In the caption of this section of his brief, the respondent asserts that the Court of Appeals "dismissed [the claim] on the independent and adequate state law ground that it was inadequately briefed." Id. In the body of the brief, the respondent asserts that the court of appeals rejected the claim because it was "inadequately developed." Id. at 22. The respondent recounts that "[t]he Wisconsin Court of Appeals explained that [the petitioner's] argument was

'completely irrational and without any logical basis' and explained, 'We cannot rule on an issue that is not cogently set forth by [the petitioner].'" Id. at 22.

The respondent also asserts that the petitioner is not entitled to relief regardless of any procedural default. Id. at 23. He maintains that Attorney Hicks did not perform deficiently when he filed the discovery motion, reasoning that it had no effect on the state's ability to present Sally L.'s medical records at the petitioner's trial. Id. at 24. The respondent explains that "Attorney Hicks merely sought to examine evidence that the State was free to use." Id. at 25. The respondent argues that "[t]his decision to seek potentially exculpatory evidence was reasonable." Id. As for prejudice, the respondent contends that the petitioner "develops no coherent argument as to how his counsel's request to examine another person's medical records could implicate his right against self-incrimination." Id. The respondent asserts that "[the petitioner] does not even attempt to explain how the introduction of these medical records—which he claims violated his Fifth Amendment right—could have affected the outcome of his trial." Id. at 26. 3.

### 3. *The Court of Appeals' Ruling*

The Wisconsin Court of Appeals characterized the petitioner's argument about the motion to compel as an argument that the petitioner "received ineffective assistance of trial counsel because Hicks should *not* have filed a discovery motion to compel production of [Sally L.'s] medical records." Dkt. No. 18-2 at ¶11. The court stated that it "agree[d] with the circuit court that 'the arguments [the petitioner] attempt[ed] to present with respect to the victim's

medical records [were] completely irrational and without any logical basis.'" Id. It said, "We cannot rule on an issue that is not cogently set forth by [the petitioner]. *See **State v. Schrreiks***, 153 Wis.2d 510, 520, . . . (Ct. App. 1989) (We do not decide claims broadly stated by the appellant but not specifically argued.)" Id.

The court also considered the petitioner's argument "that he received ineffective assistance of trial counsel because Hicks had what [the petitioner] characterize[d] as 'an actual conflict of interest.'" Id. at ¶12. Explaining that the petitioner had argued "that there was a conflict of interest because he filed an OLR complaint against Hicks for filing the motion to compel discovery of [Sally L.'s] medical records," the appellate court concluded that "[t]he fact that a client has filed an OLR complaint is, without more, legally insufficient to prove a conflict of interest." Id. It found that "Hicks's discipline was not related to his substantive representation of [the petitioner]," and that "[the petitioner] was required to show that the alleged conflict of interest affected counsel's advocacy." Id.

   4. *Analysis: The Motion to Compel*

    a. Independent and Adequate State Law Doctrine

Under AEDPA, a state prisoner must exhaust available state-court remedies before a district court will consider the merits of a constitutional claim in a federal *habeas* petition. 28 U.S.C. §2254(b)(1)(A). The exhaustion requirement gives the state an opportunity to pass upon and correct alleged violations of the federal rights of persons who are incarcerated by the state.

Bolton v. Akpore, 730 F.3d 685, 694 (7th Cir. 2013). To exhaust his claims, "[a] petitioner must raise his constitutional claims in state court 'to alert fairly the state court to the federal nature of the claim and to permit that court to adjudicate squarely that federal issue.'" Weddington v. Zatecky, 721 F.3d 456, 465 (7th Cir. 2013) (quoting Villanueva v. Anglin, 719 F.3d 769, 775 (7th Cir. 2013)). To comply with this requirement, the incarcerated person must "fairly present" the claim in each appropriate state court. Bolton, 730 F.3d at 694-95. "The failure to present fairly each habeas claim in state court 'leads to a default of the claim[s] and bar[s] the federal court from reviewing the claim[s'] merits.'" Weddington, 721 F.3d at 456 (quoting Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010)). The courts call this circumstance "procedural default."

One of the ways a criminal defendant can "procedurally default" on a claim—thus losing his right to federal *habeas* review on that claim—is if the last state court that issued judgment "'clearly and expressly' states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)). "Merits review of a habeas claim is foreclosed if the relevant state court's disposition of the claim rests on a state law ground that is adequate and independent of the merits of the federal claim." Triplett v. McDermott, 996 F.3d 825, 829 (7th Cir. 2021). "Federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds." Coleman v. Thompson, 501 U.S. 722, 729 (1991). When considering whether a state court decision rests on a state procedural

default, federal courts look to "the last explained state court judgment." Ylst, 501 U.S. at 805.

A state ground is independent "when the court actually relied on the procedural bar as an independent basis for its disposition of the case." Thompkins v. Pfister, 698 F.3d 976, 986 (7th Cir. 2012). "The test to avoid procedural default in federal court is whether the state court's decision rests on the substantive claims primarily, that is, whether there is no procedural ruling that is independent of the court's decision on the merits of the claims." Holmes v. Hardy, 608 F.3d 963, 967 (7th Cir. 2010). "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." Ylst, 501 U.S. at 801. However, "a state court that separately reaches the merits of a substantive claim may also produce an independent procedural ruling that bars federal habeas review." Holmes, 608 F.3d at 967. The question is whether the state court's procedural ruling is primary. If it is, then the procedural ruling is independent. Id. As for adequacy, a state law ground is "adequate" "when it is a firmly established and regularly followed state practice at the time it is applied." Thompkins, 698 F.3d at 986. When considering the adequacy of a state law ground, the court does not consider "whether the review by the state court was proper on the merits." Lee v. Foster, 750 F.3d 687, 694 (7th Cir. 2014).

The Seventh Circuit considers a Wisconsin court's rejection of a claim as inadequately briefed to constitute an adequate and independent state law

93

ground for *habeas* purposes. See Speener v. Maples, 150 F. App'x 541 (7th Cir. 2005); Kerr v. Thurmer, 639 F.3d 315, 323 (7th Cir. 2011), vacated on other grounds, Thurmer v. Kerr, 566 U.S. 901 (2012) (concluding that a "party's failure adequately to develop an argument has consistently been a reason to reject claims advanced by litigants in the Wisconsin state courts).

> b.      Petitioner's Briefing

The petitioner represented himself on the state appeal, and he filed an extensive brief. Dkt. No. 18-6. Pages 32 through 36 of that brief addressed the petitioner's ineffective assistance of counsel claim. Id. at 38-41. Much of that section related to the petitioner's argument that Hicks was unlicensed when he appeared at the October 4, 2012 hearing—an issue he does not raise in this *habeas* petition. But starting at page 34 of the appellate brief, the petitioner stated:

> On September 6, 2012, attorney Hicks, filed a "Defendant's motion to compel complaining witness health care records" (R. 15:7). [the petitioner], infact, **did not compel these medical records**, and within this motion were a number of [other] **intentional false statements.**
>
> > 1.)      The [petitioner], denies Sally L. (complaining witness) had facial surgery from an assault by a gang in 1980(R. 14:2-3)(App.62-63).
> >
> > 2.)      The [petitioner] categorically denies Sally L. was prescribed Hydrocodone(R. 15:2)(App.62).
> >
> > 3.)      That Sally L., gave a statement to the investigator in the instant case, Teresa Coleman, recanting a claim of sexual assault (R. 15:3)(App.62).
>
> These statements were all false, and totally fabricated by attorney Hicks. **Therefore, this motion was an act of fraud, and misconduct, by Hicks.**

94

Id. at 40 (emphasis in the original). After citing the Wisconsin Supreme Court rule prohibiting lawyers from counseling clients to engage in conduct the lawyer knows to be fraudulent, the petitioner went on:

> Prior to the hearing, on October 4, 2012, [the petitioner] notified the circuit court, of attorney Hicks misconduct(R. 17:2, 18:3, 19:2)(App. 66-72), and notified attorney Hicks by letter, and incourt on 10/4/2012, to withdraw the stated motion, and to withdraw as [the petitioner's] counsel.
>
> Hicks, incourt on 10/4/2012, **did not withdraw the motion, or the 265 pages of medical records produced thereby** (R. 99:18). SCR 20:1.2(a) states inpart: "a lawyer shall abide by a client's decisions concerning the objectives of representation". Thereby, on 10/4/2012, attorney Hicks, was **ethically bound to withdraw the motion and medical records**, and the case law is in support; "The attorney client relationship is one of agent to principal, and as agent the attorney must act in conformity." *Olfe v. Gordeon*, 93 Wis.2d 173, 182 . . . (1980).
>
> Clearly on 10/4/2012, attorney Hicks [refusal] to abide by [the petitioner's] request to withdraw the 265 pages of Sally L. medical records, the **[poisonous fruit]** of his **[fraud],** and the total [dis]regard of [SCR's], governing attorney conduct, was [ir]refutably **"outside the wide range of professionally competent assistance,"** cited by the U.S. Supreme Court in *Strickland*, 466 U.S. at 690. Further, this was [without] question harmful to [the petitioner's] defense as the [State] entered these medical records into evidence [against] [the petitioner] at the trial of the instant case(R. 108:89)(App. 93-94).

Id. at 40-41 (emphasis in the original).

### c. Whether there was procedural default

The Court of Appeals did not say that it rejected the petitioner's claim about the motion to compel on the ground that he failed to brief it. Indeed, the record shows that the petitioner *did* brief the issue. Nor did the court state that the petitioner had "inadequately developed" the claim, as the respondent puts it. The appellate court expressed its agreement with the trial court that the

95

arguments the petitioner had presented were "irrational" and "without any logical basis." Dkt. No. 18-2 at ¶11. Then, it stated that it "could not rule on an issue that [was] not cogently set forth" by the petitioner. Id. It cited State v. Scherreiks, 153 Wis. 2d 510, 520 (Wis. Ct. App. 1989), in which the court stated, "Simply to label a claimed error as constitutional does not make it so, and we need not decide the validity of a constitutional claims broadly stated but never specifically argued." (Citations omitted).

This court cannot conclude that the state court based its decision on an independent and adequate state ground. The court addressed the merits of the petitioner's claim, albeit in a single sentence. This court reads the appellate court's statement that it could not rule on an issue "not cogently set forth" by the petitioner as nothing more than a statement that the petitioner's arguments made no sense to the court (a proposition for which the case it cited, Scherreiks, does not appear to stand).

> d. Whether the Court of Appeals' decision was the result of an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

The Court of Appeals concluded that the petitioner's arguments regarding the motion to compel were irrational and without any logical basis, as did the trial court. This conclusion did not involve an unreasonable application of federal law or result from an unreasonable determination of the facts.

It is difficult to understand the petitioner's claims regarding the motion to compel. Prosecutors are constitutionally required to turn over evidence that

96

is favorable to a criminal defendant if the defendant asks for it. <u>Brady v. Maryland</u>, 373 US. 83, 87 (1963). This is to make sure that criminal defendants get a fair trial. <u>Id.</u> Attorney Hicks filed a motion asking the court to require the state to produce Sally L.'s medical records and listed several reasons why he believed those records might contain evidence that would be useful to the defendant in attacking Sally L.'s credibility. Dkt. No. 23 at 38. If those records *had* contained evidence that Sally L. had been untruthful about her injuries or her health condition, that could have been helpful to the petitioner's defense. A defense attorney asking to see state's evidence that might help his client does not constitute deficient performance that falls below an objective standard of reasonableness.

The petitioner argues that Attorney Hicks made representations in the motion to compel that the petitioner says were not true—stating, for example, that the petitioner did not believe Sally L. had had facial reconstructive surgery when, in fact, the petitioner knew that she had, or stating that the petitioner had denied that Sally L. was prescribed Hydrocodone when, in fact, the petitioner knew that she had been prescribed Hydrocodone (and had asserted that she was giving it, or selling it, to other people). It appears that what upset the petitioner about the motion was not that Hicks filed it, or that he requested the medical records; it was the fact that the reasons Hicks gave for believing that the medical records might contain evidence helpful to the defendant were the wrong reasons. In the letter received by the court on September 26, 2022 and again in the letter the court received on October 2, 2012, the petitioner

97

told the court that he *had* wanted Sally L.'s medical records, but that he wanted them for the purpose of proving that brain lesions impaired her mental functioning. Id. at 48, 50. The petitioner told the court that he wanted the records—he just wanted Attorney Hicks to give a different reason for asking for them.[8] The fact that Attorney Hicks may have given the wrong reasons for requesting evidence the petitioner himself wanted Hicks to obtain, and that might have been helpful to the petitioner, does not constitute deficient performance that falls below an objective standard of reasonableness.

The first page of the motion to compel indicates that Hicks filed the motion for "the purpose of an in camera inspection, pursuant to Wis. Stat. § 971.23(6m)", id. at 38—that is, he asked the court to require the state to produce the medical records to *the court*, so that it could review them and, if necessary, prevent the state from using any of the records that were not relevant to the issues at trial. That is not deficient representation that falls below an objective standard of reasonableness. It appears to have been an effort both to obtain helpful information for the petitioner and to prevent the state from using irrelevant and immaterial medical records at trial.

The petitioner complains that Hicks did not withdraw the motion when the petitioner asked him to. He appears to be under the impression that an attorney provides constitutionally ineffective assistance any time the attorney does not follow his client's instructions. That is not necessarily the case.

---

[8] The petitioner insists in this federal *habeas* case that he was not the one "compelling the complainant's medical records." Dkt. No. 22 at 18.

While an attorney "undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy," *Florida v. Nixon*, 543 U.S. 175, 187 . . . (2004) (citation omitted), the attorney also has the "full authority to manage the conduct of the trial" and need not consult with the client on "every tactical decision," *Taylor v. Illinois*, 484 U.S. 400, 418 . . . (1988).

United States v. Jones, 844 F.3d 636, 643-44 (7th Cir. 2016). The petitioner says that Wisconsin's Supreme Court Rule 20:1.2(a) requires a lawyer to follow a client's decisions regarding the "objectives of representation," but he does not explain how Hicks's failure to withdraw the motion related to the "objectives of representation," and an alleged violation of the state's legal ethics rules does not constitute ineffective assistance of counsel unless the petitioner can show that the violation was behavior that fell below an objective standard of reasonableness and that affected the outcome of the proceedings. The petitioner has not made that showing.

The petitioner's insistence that Hicks should have withdrawn the motion seems to be linked to his argument that he was prejudiced by the state's use of the medical records at trial. He asserts that the prosecution "entered into evidence against him the complainant's medical records fraudulently compelled into the proceedings by Atty. Hicks," dkt. no. 22 at 19, and says that he was "forced to incriminate himself at trial by the use of the complainant's medical records against him, and over his objections," dkt. no. 11 at 20. As the respondent points out, the petitioner misunderstands the role of the motion to compel. The state already had the medical records before Attorney Hicks filed the motion. Attorney Hicks filed the motion because he wanted to be able to see

99

and review evidence the state already had in its possession. The motion itself did not compel the state to use the medical records against the petitioner at trial, nor did it force the state to obtain evidence it otherwise would not have had.

The petitioner stated in his brief in support of the *habeas* petition that Hicks "allowed the prosecution to enter these documents into evidence against the petitioner at trial" and that Hicks did not use the medical records in his defense. Dkt. No. 22 at 14. He does not explain what Hicks could, or should, have done to prevent the state from using the records. He does not explain how the state's use of the records harmed his defense. He does not explain what evidence the records contained that Hicks could have used to help him. Nor does the petitioner explain how the fact that the state used the medical records at trial forced *him* to "incriminate" himself. And he does not explain how the outcome of the trial would have been different had Hicks withdrawn the motion to compel.

The trial court's conclusion, and that of the Court of Appeals, that the petitioner's arguments about the motion to compel made no sense were not the result of unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented.

### 5. *Analysis: The Conflict of Interest*

The petitioner has failed to develop his conflict-of-interest argument before this court. He states in his brief that he argued to the state court of appeals that "his right to counsel was violated by his counsel having a conflict

of interest." Dkt. No. 22 at 13. He asserts that Hicks's refusal to withdraw the motion "put him and Atty. Hicks in conflict and prejudice should be presumptive." Id. at 15. He states that he "never made claim his due process right to counsel was violated merely on the grounds of filing a complaint with the Office of Lawyer Regulations." Id. at 16. He asserts that Hicks admitted that "his representation was in conflict with the petitioner's best interest." Id. at 20. These sparse references comprise his conflict-of-interest argument.[9]

The only part of this argument that comes close to a basis for *habeas* relief is the petitioner's assertion that he never argued to the Wisconsin Court of Appeals that his filing of an OLR complaint against Hicks was the sole basis of his "due process right to counsel" claim. But the petitioner *did* argue to the Court of Appeals that he filed a "meritorious grievance" against Hicks, dkt. no. 18-6 at 27, 31, and cited to that court a Seventh Circuit case holding that a client's filing of a grievance with the Wisconsin State Bar and allegations of misconduct constitute an actual conflict of interest, dkt. no. 18-6 at 32. The petitioner discussed the OLR proceedings in some detail. Id. at 34-35. Even accepting the petitioner's argument that his argument was broader than the way the Court of Appeals described it, the Court of Appeals concluded that the

---

[9] The petitioner objects to the Court of Appeals treating the motion to compel issue and the conflict-of-interest issue separately. Dkt. No. 22 at 16. It is not clear why. Although the petitioner's belief that Hicks had a conflict stems from the fact that Hicks was not doing what the petitioner repeatedly asked him to do (withdraw the motion to compel), the legal analyses for whether refusing to withdraw a motion to compel constitutes ineffective assistance and the whether having a conflict of interest constitutes ineffective assistance are not necessarily the same.

petitioner had not shown how the alleged conflict impacted Hicks's advocacy. The petitioner has not made that showing to this court, either.

The Court of Appeals' conclusion that the petitioner did not demonstrate that Hicks's alleged conflict of interest constituted ineffective assistance of counsel was not contrary to clearly established federal law and was not based on an unreasonable determination of the facts.

D. Judicial Bias

On April 6, 2021, the petitioner filed a motion to dismiss his judicial bias claim. Dkt. No. 13. Three days later, he filed a motion asking to correct some page numbers in the motion. Dkt. No. 17. The court failed to rule on those motions before the respondent filed his answer to the complaint and before the parties had briefed the petition. The court will grant the motion; the petitioner was right to file it. The petitioner has not demonstrated to this court that the Court of Appeals erroneously concluded that he did not develop this argument (dkt. no. 18-2 at 6-7). His brief to the Court of Appeals discussed his disagreement with the trial court's substantive rulings. Dkt. No. 18-6 at 45-52. But he did not explain to the Court of Appeals how the fact that the trial court ruled against him showed that it was objectively or subjectively biased again him and he has not provided this court with that explanation. The petitioner has made clear that he disagrees with the trial court's various rulings, but "adverse rulings, without more, do not provide bias." Owens v. Evans, 878 F.3d 559, 566 (7th Cir. 2017).

The court will grant the petitioner's motion to withdraw this claim. Dkt. No. 13. Because the court is allowing the petitioner to withdraw this claim, it will deny as moot his motion to correct the motion. Dkt. No. 17.

## III. Other Motions

On May 27, 2021, the court received from the petitioner a motion asking the court for instructions regarding formatting and procedure for filing documents. Dkt. No. 20. The petitioner's brief was due a little over a month later, on July 6, 2021. Dkt. No. 19. In the motion, the petitioner asked if he could "go forward and file his habeas brief and appendix with [] documents he ha[d] that [did] not have the habeas case number, filed date, and page and document number," or whether it was "incumbent that the petitioner's habeas appendix have the habeas case number, filed date, and page and document number of the respondents answer." Id. at 2. The court regrets its failure to rule on this motion in a timely fashion, but the petitioner provided the court with extensive documentation and it was able to find what it needed in the record. There was, and is, no need for the petitioner to modify his appendix to to include the information he mentioned. The court will deny this motion as moot. Dkt. No. 20.

On June 17, 2021, the petitioner filed a motion asking the court to expand the record with various briefs, transcripts, orders and other filings from his and related state court proceedings. Dkt. No. 24. He stated that he was submitting each document as a part of an appendix to his brief in support of his petition. Id. at 2. The court has reviewed these documents (and the briefs

and other documents the petitioner has filed) in rendering this decision and has cited to several of the documents the petitioner sought to add to the record. The court will grant the motion to the extent it asked the court to consider those filings. Dkt. No. 24.

## IV.    Conclusion

The court **GRANTS** the petition for writ of *habeas corpus* under 28 U.S.C. §2254. Dkt. No. 1. The court **ORDERS** that the State of Wisconsin has 120 days to either release the petitioner or initiate proceedings to retry him.

The court **GRANTS** the "Petitioner's Motion to Motion to Dismiss Claim of Judicial Bias Against Wisconsin Court of Appeals." Dkt. No. 13.

The court **DENIES AS MOOT** the "Petitioner's Motion to Correct Document." Dkt. No. 17.

The court **DENIES AS MOOT** the "Petitioner's Motion to Motion for Directions From the Court." Dkt. No. 20.

The court **GRANTS** the "Petitioner's Motion too Motion to Expand Record." Dkt. No. 24.

Dated in Milwaukee, Wisconsin this 14th day of March, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**